**KINNETT DAIRIES, INC., Plaintiff,**

v.

**DAIRYMEN, INC., Defendant.**

Civ. A. No. 1701.

United States District Court,
M. D. Georgia,
Columbus Division.

March 10, 1981.

Maxwell M. Blecher, Consuelo S. Woodhead, Blecher, Collins & Hoecker, Los Angeles, Cal., Albert W. Stubbs, Hatcher, Stubbs, Land, Hollis & Rothschild, Columbus, Ga., for plaintiff.

William A. Carey, John Sherlock, Barnett, Alagia & Carey, Washington, D. C., W. M. Page, Page, Scranton, Harris, McGlamry & Chapman, Columbus, Ga., for defendant.

I

## GENERAL BACKGROUND

BOOTLE, Senior District Judge:

This is a civil antitrust action for treble damages and injunctive relief under the antitrust laws. The plaintiff, a dairy processor, is a Georgia corporation with its principal place of business in Columbus, Georgia. The defendant is a milk marketing association with its principal place of business in Louisville, Kentucky. This court has jurisdiction over the subject-matter and parties, and venue is properly laid in the Middle District of Georgia.

This action was commenced in August 1973 and was tried to the court without a jury in May and June of 1980. The trial itself lasted three weeks and resulted in a transcript in excess of 2,800 pages, plus uncounted pages of exhibits and depositions and transcript of testimony from trials of other cases. Originally, the plaintiff alleged violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2 (Supp. 1980)), Sections 2 and 3 of the Clayton Act (15 U.S.C. §§ 13 and 14 (1973)), Section 4 of the Agricultural Fair Practices Act of 1967 (7 U.S.C. § 2303 (1973)), and breach of contract. By time of trial, however, the scope of the complaint had narrowed considerably, the plaintiff charging only violations of Sections 1 and 2 of the Sherman Act.[1] The

---

1. Section 1: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. *Every person who shall make any* contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court."

Section 2: "Every person who shall *monopolize*, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and,

plaintiff charges that the defendant, acting alone and in concert with other milk producers, and other milk marketing associations, attempted to and did successfully restrain trade and commerce in and monopolize the supply of raw Grade A milk. The plaintiff complains that the defendant entered into a series of anticompetitive arrangements with other cooperatives with the purpose and effect of obtaining or maintaining monopoly power, and undertook specific predatory acts against dairy processors, including the plaintiff. The defendant's response to these charges is twofold. The defendant first contends that its conduct amounted to legitimate marketing behavior which did not violate the proscriptions of the Sherman Act. The defendant also contends that even if its behavior might ordinarily be in violation of Sections 1 and/or 2, nevertheless, as an agricultural cooperative, it is entitled to the benefit of the antitrust exemptions provided by Section 6 of the Clayton Act (15 U.S.C. § 17 (1973))[2] and the Capper-Volstead Act (7 U.S.C. § 291 (1980))[3] (hereafter referred to collectively as the Capper-Volstead Act or the C–V Act).

The facts involved here do not lend themselves to a simple recitation. The case bristles with a multitude of intertwined issues. Because of this, it is extremely difficult to "compress them into an opinion that will not be of fatiguing prolixity."[4] To resolve the issues involved, it is necessary to have a knowledge of the parties to this action and to analyze each activity of the defendant which serves as the basis of the plaintiff's charges. Accordingly, this memorandum opinion is intended to suffice as findings of fact and conclusions of law under Rule 52, Federal Rules of Civil Procedure,[4a] and its form is as follows:

### I
### GENERAL BACKGROUND

### II
### THE PARTIES

| | | p. |
|---|---|---|
| A. | The Plaintiff | 613 |
| B. | The Defendant | 613 |
| | (1) Formation and Structure | 613 |
| | (2) Functions | 613 |

on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court."

2. "The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purpose of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."

3. "Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations

and their members may make the necessary contracts and agreements to effect such purposes: *Provided, however,* That such associations are operated for the mutual benefit of the members thereof, as such producers, and conform to one or both of the following requirements:

First. That no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein, or,

Second. That the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum.

And in any case to the following:

Third. That the association shall not deal in the products of non-members to an amount greater in value than such as are handled by it for members."

4. *United States v. United States Steel Corp.,* 251 U.S. 417, 437, 40 S.Ct. 293, 294, 64 L.Ed. 43 (1920).

4a. Each statement herein, to the extent that it purports to be factual, is intended as a finding of fact, and to the extent that it is expressive of a legal opinion or conclusion of law, is intended as a conclusion of law.

### III
### ACTIVITIES OF DEFENDANT 614

A. Joint Activities 614

 (1) The Georgia Super Pool 614

 (2) Great Lakes-Southern Milk, Inc. 615

 (3) The Standby Pool 615

B. Unilateral Activities 617

 (1) Premium Pricing Policy 618

 (2) Disputes with Handlers 618

 (a) Sealtest-Nashville 618

 (b) Sealtest-Atlanta 619

 (c) Sealtest-Chattanooga 619

 (d) Broughton Co. 619

 (e) Pet-Jackson 619

 (f) Mayfield Dairy Farms 619

 (3) Written Supply Contracts Note 620

 (4) Supply Cut-offs 621

 (a) Kinnett 621

 (b) Borden 622

 (5) Hauling Cut-off 622

### IV
### FACTUAL BACKGROUND AS TO SHERMAN ACT SECTION 2 CHARGE 623

A. Facts Relating to Product Market 623

B. Facts Relating to Geographic Market 624

 (1) The Area in Which Seller Operates 624

 (2) The Area to which Buyer Can Practicably Turn 624

 (3) Down Allocation, Compensatory Payments and Base Plan 625

 (4) The "Submarket" Contention 627

C. Facts Relating to Market Power 628

 (1) Defendant's Share of the FMO-7 Area 628

 (2) Defendant's Share in Each of its Four Proposed Alternative Markets 629

 (3) Defendant's Share in Plaintiff's Proposed Nine-Federal Order "Submarket" 629

### V
### CONCLUSIONS OF LAW 630
### AND
### APPLICATION OF THE FACTS TO THE LAW

## II
## THE PARTIES

A. *The Plaintiff.*

The plaintiff, Kinnett Dairies, Inc. (Kinnett) is a closely held Georgia corporation with its principal place of business in Columbus, Georgia. Kinnett is primarily engaged in the processing of Grade A milk for fluid consumption. To a lesser extent, it is also in the business of manufacturing ice cream.

B. *The Defendant.*

### (1) Formation and Structure

Dairymen, Incorporated (D.I.) is a non-profit agricultural milk marketing association organized and existing under the laws of the state of Kentucky and qualifying as a Capper-Volstead marketing association. D.I. was formed in 1968 as a combination of and successor in interest to eight cooperatives located throughout the southeastern United States. Today, D.I. has ten separate divisions serving this area. These geographically distinct operating divisions are responsible for the day-to-day marketing operations carried on by the cooperative, including quality control, hauling arrangements with proprietary handler customers assigned to the division, and resolution of handler and/or producer complaints.

The membership of D.I. consists solely of dairy farmers ("producers") who produce raw milk to be marketed for commercial use in dairy products. Each D.I. member signs a Membership Marketing Agreement which gives D.I. authority, *inter alia*, to market the member's milk. Since its formation, D.I. has had a board of directors elected under a delegate system from among its members. This board sets the policies and has final authority over all major decisions which may affect the cooperative as a whole.

### (2) Functions

Some of the reasons the defendant offers for its existence are:

(a) to give producers more representation in the marketplace;

(b) to ensure that producers obtain a fair, secure, and guaranteed market for their product;

(c) to provide its members some countervailing power with which to bargain with processors for prices above the federal order minimum price and more reflective of market conditions;

(d) to provide members with improved and more efficient assembly and distribution of milk; and

(e) to accomplish more easily by consolidated effort the intermarket alignment of raw milk prices.

Perhaps the best "nutshell" statement of the function of D.I., and of marketing cooperatives in general, is that they exist to provide their members with the best return possible for their product. Raw milk can be utilized in one of two ways. It can be used for fluid consumption (Class I utilization) or it can be used for making certain "manufactured products" like butter, cheese, or ice cream (Class II and III utilization). A dairy farmer can get more money for his milk if the processor uses it for "fluid" purposes. Consequently, these farmer producers desire that as much of their milk as possible obtain a Class I utilization. Cooperatives like D.I. exist to help the producers obtain this goal. Of course, the producer would also like to avoid having to dump his surplus milk (milk in excess of the fluid milk needs of processors) down the drain. The cooperative aids the producer in this respect by finding Class II and Class III markets for the surplus milk.

## III

### ACTIVITIES OF DEFENDANT

The plaintiff contends that the defendant engaged in a course of conduct designed to obtain and maintain the power to control prices and exclude competition in the supply of raw milk in the Georgia marketing area, and that this conduct exceeded any legitimate functions of a cooperative bargaining for the sale of its members' milk. The conduct complained of can be divided into two categories: D.I.'s involvement with other marketing associations (joint activities), and its individual conduct toward Kinnett and other dairy processors (unilateral activities).

### A. Joint Activities

In its most recent brief (Plaintiff's Reply to Defendant's Post Trial Brief) the plaintiff contends that the following listed incidents of joint activity by the defendant evidence a scheme of cooperative monopolization which includes predatory conduct and that such conduct is neither legitimate nor immune from suit.

The defendant, on the other hand, contends that all this activity is a part of the "legitimate objects" of a Capper-Volstead (C–V) organization and is a part of the conduct of "processing, preparing for market, handling and marketing . . . and hav[ing] marketing agencies in common . . . [and] mak[ing] the necessary contracts and agreements to effect such purposes." [5]

### (1) The Georgia Super Pool

The Georgia Super Pool is a group of C–V cooperatives in Georgia which appoints one of its number to serve as the marketing agent for the members. D.I. has been this common marketing agent since 1970. The pool has two main functions: disposal of the surplus milk of its members; i. e., milk not needed by the members for their own processing plants,[6] and establishing a formula for distribution of milk payments received which are in excess of the federal order minimum price for the FMO–7 order.[7]

---

**5.** 7 U.S.C. § 291.

**6.** Cooperatives are of two types: a *"bargaining"* co-op is strictly concerned with the marketing of its members' milk, and maintains no processing facilities, i. e., dairies. An *"operating"* co-op does own processing facilities and, to the extent it desires, processes its members' raw milk in its *own* facilities. All the members of the Super Pool except D.I. are *"operating"* co-ops.

**7.** FMO–7 is the Federal Milk Marketing Order for the Georgia area. It was promulgated by the U.S.D.A. and established, *inter alia*, a minimum price which all handlers regulated by that Order (like Kinnett) must pay to Georgia producers for their milk. Any price asked for by the producers which is in excess of this federal

The plaintiff contends that both functions of the Super Pool operate to neutralize competition among the cooperatives in Georgia and to give D.I. effective control over the outside disposition of the bulk of locally produced milk. It contends that, since 1969, substantial amounts of surplus milk have been produced by the Super Pool members and, that in the absence of the Super Pool, these members would have been willing and able to sell surplus milk to Kinnett. The defendant's response is that without the Super Pool, members would have had to make "distress" sales at prices below the cost of production in order to get rid of their surplus milk. It contends that the formula for distributing premiums among its member cooperatives does *not* stifle competition, but rather, provides for an equitable distribution which serves as an attempt to avoid retail price wars which had been so harmful to Georgia dairy farmers in the past. It contends further that the Capper-Volstead Act not only permits but encourages agreements among cooperatives to dispense with competition among themselves.

### (2) Great Lakes-Southern Milk, Inc.

Great Lakes-Southern Milk, Inc. (GLSM) is a federation of dairy cooperatives covering a geographic area more or less reflected by its name. D.I. has been a member of GLSM since October 1968.

The stated goal of GLSM at its formation was to put an end to processors "playing one market or one cooperative against another" in order to bring down the raw milk prices. Its functions include: improving the prices of the dairy farmer members of the member cooperatives, attempting to assure that the prices in the various markets served by member cooperatives are in alignment, providing a forum for discussion of Class I prices and alignment, and making recommendations for Class I pricing and price alignments.

Kinnett charges that the federation effectively eliminates competition in the sale of raw milk and confers upon its members the power to control prices throughout the designated market served by each member. It complains that D.I., and the other member cooperatives of GLSM, coordinated their pricing changes and that this alignment eliminated the obstacle associated with raising Class I prices—the failure of cooperatives in neighboring markets to raise their prices as well. D.I. counters that GLSM is a necessary organization by which producers can meet processors on equal terms; that its marketing information and pricing recommendations aid in establishing an orderly market; i. e., one in which there is an economic movement of milk and the existence of a general understanding of what all markets are doing; and that because of milk's perishability, this marketing information is necessary to facilitate decisions by members concerning supply, volume, alternate sources, where to dispose of excess, and other marketing needs.

### (3) The Standby Pool

The Standby Pool (ARSPC) is a federated agricultural cooperative whose members are Capper-Volstead cooperative associations. It performs two related operations: the establishing of a "reserve supply" of milk by purchasing "options" on unregulated milk in the upper Midwest and, the purchasing and sale of milk from that reserve supply. It is possible to establish a reserve supply because of the chronic surplus of Grade A milk which exists in the upper Midwest area, primarily in Minnesota and Wisconsin. What ARSPC does is purchase "options" on much of this surplus Minnesota and Wisconsin milk. This option requires participating manufacturing plants in those areas to hold this surplus milk for a certain length of time before using it for their own purposes.[8] If ARSPC does call on the milk for

order minimum' price is an "over-order" amount or "premium."

8. To qualify for the option payments, a manufacturing plant had to meet certain require-

ments. Among other things, it had to have a Grade A rating and had to have a minimum of 50,000 lbs. per day. In addition, the plants were required to own manufacturing facilities capable of processing their milk.

use in a market to the South, they will pay for the milk itself.[9] This payment would be *in addition to* the option payment.[10] If ARSPC has not exercised its option on the milk within the specified time, then the manufacturing plant is free to use it in any way it wishes.[11] For the purposes of this case, these manufacturing plants were all owned by farmer cooperatives. (Tr. 204, 207–208; Stip. ¶ 217).

The plaintiff contends that ARSPC operates as a device by which cooperatives in the South can obtain control over the Minnesota-Wisconsin supply of unregulated surplus milk to keep it from being sold in markets to the South in competition with those cooperatives. In the absence of the

Standby Pool, Kinnett argues, this great surplus of Midwest milk would be attracted to southern markets because of the premium prices for milk there, and that through ARSPC, southern cooperatives like D.I. paid [12] producers in the high production states to keep and process their milk in that area and not to sell it in markets to the South in competition with these cooperatives, i. e., they protected premium prices by keeping milk off the market.

The defendant contends and the court finds that there is a need to maintain a reserve supply of milk. Supply and demand in the southern milk markets are cyclical; i. e., there are times of peak and times of low supply and demand. Unfortunately, when

9. Before the Minnesota-Wisconsin area became pooled on a Federal Order (June 1, 1976), ARSPC would pay the participating plants an amount for the milk equal to what the manufacturing plant could get for it from the nearest federal order.

10. The mechanics of the option payments work as follows: Each member cooperative of the Standby Pool would pay into a fund a reserve pool "assessment", based upon that cooperative's total Class I sales. The monies in the fund were then distributed to unregulated milk manufacturing plants in the Minnesota-Wisconsin (M–W) area based upon a formula designed to provide the plants (and the producers serving them) with a return about equal to what they would have received as pool plants under the nearby federal order.

11. It should be noted that the terms of the contracts between the participating plants granting the options and the Standby Pool changed several times between 1970 and 1976. The 1970 contracts gave the Standby Pool a right of first refusal on the milk for a period beginning "at least 24 hours prior to ... time of farm pick up" and continuing until 12 hours after receipt of the raw milk at the receiving facilities. It also provided that "in the event Associated Reserve Pool does not exercise its option, the supplier may use or commit for use any of its Grade A milk supply for production of manufactured milk products, but will not accept any offer from or make a sale to, another purchaser of milk for other than manufacturing use without giving notice to Associated Reserve Pool of its intent to sell such milk and afford Associated Reserve Pool its right of first call on such milk."

The 1971 contract retained the time period in which the Pool could exercise its option; i. e., from 24 hours before pick-up to 12 hours after

receipt at the plant. However, the requirement that the supplier only use milk, not called on by the Pool, for manufacturing purposes unless first notifying the Pool was not included in the 1971 or subsequent contracts.

By 1973, both provisions had been changed: The Pool could exercise its option by telephone notification "at least 24 hours prior to the approximate time of shipment" and milk on which the option was not exercised was "free of any marketing rights of ARSPC."

In 1976, yet another modification occurred, the time for exercising the option being "at least 24 hours prior to the time of farm pick-up", and the reference to milk on which the option was not exercised allowing the supplier to retain it "for such use or disposition as it shall determine."

There is some question as to whether or not some of these changes were required, or at least encouraged, by certain consent decrees entered in *United States v. Associated Milk Producers, Inc.*, 394 F.Supp. 29 (1975) and *United States v. Mid-America Dairymen, Inc.*, 1977–1 Trade Cas. ¶ 61,509. The *AMPI* consent decree was entered on April 30, 1975; however, the antitrust case leading to the decree was initially filed on Feb. 1, 1972. The *Mid-America* action commenced on Dec. 27, 1973 and the decree was entered on May 17, 1977. It is admitted that at least the 1976 change—"for such use ... as it shall determine"—was placed there because of the *AMPI* consent decree (Smith Dep. at p. 271). And it is reasonable to assume that, at least after the initial (1971) contract change, the *AMPI* and *Mid-America* cases had some influence on the terms of the Standby Pool contracts.

12. The defendant does not presently belong to ARSPC. Its membership was from 1970 to 1978.

the supply of milk for the market is lowest, the demand tends to be the highest, and vice versa. In these "short seasons", when total milk supply is less than or equal to the fluid milk demand, the chronic surplus of Grade A milk in the upper Midwest can provide the needed reserve supply for the southern states. Membership in ARSPC would be beneficial because it would provide the means for obtaining dependable supplemental Grade A milk supplies at reasonable predetermined prices, thus eliminating the need to develop and maintain costly year-round local reserves. For ARSPC members, payments made to fund the option payments to the supply plants were like insurance payments to have milk available when needed.

The defendant denies that the Standby Pool was intended to prevent Kinnett or anyone else from obtaining supplemental milk. As support, it notes that from the Standby Pool's inception there have been at least eight billion pounds of Grade A milk in Minnesota and Wisconsin annually on which the pool has no options, which was not used for local fluid sales, and which could have moved freely to Kinnett. The pool's options have rarely exceeded approximately 1.6 billion pounds of milk annually. The plaintiff's response to this is that although ARSPC's options on the total amount of Grade A milk in the M–W area were relatively small, it did have options on the bulk of the *unregulated* milk in the area. The significance of this, according to the plaintiff, is that it is this unregulated milk which is most likely to be attracted to the southern markets.

The plaintiff also contends that the amounts of milk under contract with the Standby Pool greatly exceeded the total needs of its members for reserve supplies. The plaintiff points out that, even in the fall of 1973 when there was supposedly an "emergency" shortage condition, only 39.6 percent of milk committed to ARSPC was shipped in any one month, and never in the Standby Pool's history up to 1976 did amounts shipped exceed 11.1 percent of the yearly amounts under option. The defendant, of course, disagrees with this assessment and points out that there have been times when the amounts of milk under option to ARSPC have been barely sufficient to meet the supplemental fluid needs of its members during the "short" seasons. As an example, in 1975 and 1976 ARSPC had the milk of twelve supply plants under option. Taking a sample of seven days, there were twenty-two occasions on which the ARSPC shipments exhausted the supplies available in certain of the supply plants: And during the period 1972 through 1975 the following amounts were shipped: 1972—122,278,000 lbs.; 1973—233,755,000 lbs.; 1974—82,223,000 lbs.; 1975—95,374,000 lbs. (total amount shipped equaled 533,630,000 lbs.)

### B. *Unilateral Activities*

The plaintiff, in its most recent brief, lists at length its complaint against the following unilateral activities of the defendant:

(1) announced non-negotiable premium prices unilaterally;

(2) cut off Kinnett's profitable hauling operation in retaliation for Kinnett's having dared to compete legitimately for supplies from individual farmers;

(3) repeatedly threatened to, and often actually did, cut off any customer who tried to replace any portion of DI's supplies, regardless of the volume involved with the contemplated substitute, the time of year, the notice afforded to DI (oftentimes more than DI gave its customers prior to cutting them off), the reason for the proposed substitution or its source;

(4) successfully warded off the entry of a potential competitor, NFO, into the Georgia market by cutting off its entire supply to Sealtest-Atlanta, some 75%–80% of that plant's requirements in retaliation for Sealtest's attempt to obtain some 20%–25% of its needs from NFO;

(5) subsequently insisted upon full supply contracts and, following successful litigation against it, committed volume contracts which tended to lock processors in

to dependence on DI and lock potential competitors out of the processor market for their milk; and used additional, thinly veiled, cutoff threats to induce processors to sign the contracts;

(6) cut off Kinnett's entire DI supply on no notice in the middle of the tightest season in years, in deliberate breach of the committed supply contract which DI itself had insisted upon;

(7) continued, even after this action was filed, to take affirmative steps in an effort to stop Kinnett from receiving alternative sources of supply, including continued threats not to deal with Kinnett (or to sell to it only at special supplemental milk prices) and renewed insistence on year-long committed volume contract, this time one which contained no ceiling or limit on the prices DI could impose unilaterally.

The plaintiff recognizes that these actions, in themselves, would not violate Section 1 of the Sherman Act because a single cooperative should be treated as a single entity, the equivalent of a business corporation, and Section 1 does not touch unilateral activity of a single enterprise.

The defendant contends that all of such activity on its part was lawful and supported by ample legitimate business justification and in fact was necessitated to protect the interests of the milk producers, and that moreover, all of it was a part of marketing and was covered by the Capper-Volstead exemption.

### (1) Premium Pricing Policy

The plaintiff complains of the allegedly excessive prices the defendant charged for its milk. To understand the arguments surrounding this "premium" price, it is first necessary to understand the nature of the Federal Order System. Under this system, minimum prices are established by the

United States government for Class I and Class II milk, with Class I milk having a higher minimum price.[13] All handlers (like Kinnett) regulated on a particular order must pay this minimum price for the milk they receive from the producers. All the producers share equally in the order revenues from the combined higher priced Class I sales and the lower priced Class II sales through the receipt of an announced federal order "blend" price.

The federal order does *not* establish the maximum price which producers may receive for milk which handlers purchase. Any price they charge which is in excess of this minimum price is an "over-order premium." The plaintiff complains that the over-order premiums set by D.I. were artificially and unreasonably high, and contain what plaintiff refers to as a "monopoly increment." It is the defendant's contention, however, that it was necessary to charge the premium it did for its members' milk because the minimum prices for Grade A milk in the Georgia federal order did not establish realistic prices. The Class I differential has remained basically the same since 1969 in spite of rapidly increasing transportation costs, which today are far above 15 cents per 100 miles. The defendant claims that because of these increased transportation costs and inflation, over-order pricing is necessary to attract an adequate supply of milk for Georgia handlers.

### (2) Disputes with Handlers

(a) *Sealtest-Nashville* : Prior to their disputes, D.I. (and its predecessor) had been supplying Sealtest-Nashville with the majority of its fluid milk needs. At a February 11, 1970 meeting between Sealtest and D.I. officials, Sealtest attempted to persuade D.I. to reinstate special pricing provisions which had existed for sales made by Sealtest in the southern Kentucky area, but

13. The Class I price is determined for each federal order in the following manner: First, the Administrator takes the average price which a number of milk manufacturing plants in Minnesota and Wisconsin pay for Grade B milk; the Administrator then adds 90 cents to this M–W price and gets the minimum Class I price at Eau Claire, Wisconsin (the "base point"); to this base-point minimum price is added 15 cents per cwt. of milk for every 100 miles which the milk travels from the Eau Claire base point. (The 90 cents plus 15 cents/cwt/100 miles is called the "Class I differential".)

which D.I.'s predecessor had terminated. Sealtest, failing to get these provisions reinstated, undertook to replace about 10 percent of the milk D.I. was supplying by placing sales with National Farmers Organization (NFO), a rival cooperative. When D.I. heard about this, it put Sealtest-Nashville on an irregular basis in supplying it milk, and notified it that all milk sold would be at Class I prices. This first dispute was resolved in April 1970, when the defendant agreed to restore the special pricing provisions and Sealtest granted the defendant the right to supply it with all milk, except that supplied by certain NFO producers. Subsequently, other disputes occurred between the parties, the net result of which was a reduction in Sealtest-Nashville's purchases of D.I. member milk from 100 percent in early 1970 to 37 percent in 1974. It should be noted that Sealtest often gave the defendant no notice as to when their sales were to be reduced, and used its NFO agreement as a wedge to secure concessions from the defendant, just as the defendant was using its strong supply position as a wedge to force Sealtest to accept a full-supply agreement.

(b) *Sealtest-Atlanta* : In the autumn of 1970, the defendant supplied some 60 percent of Sealtest-Atlanta's raw milk needs. The defendant claims that Sealtest substantially reduced its purchases from D.I. with little notice. This reduction occurred around Christmas 1970, when Sealtest gave D.I. three days notice of a 17 percent reduction of milk purchases from D.I. In retaliation, D.I. informed Sealtest that if it replaced some milk it would have to replace *all* of its purchases from D.I. Sealtest did this; however, it experienced "quality" problems with its new supplies and consequently resumed its purchases with the defendant. However, this settlement was only temporary. Other disputes occurred, and today D.I. sells little milk to Sealtest-Atlanta.

(c) *Sealtest-Chattanooga* : Sealtest's processing plant in Chattanooga purchased 100 percent of its raw milk needs from D.I. during 1970. In September of 1970, D.I. increased its price for Class I milk and

Sealtest began to look for other sources of supply to replace its purchases from D.I. On June 22, 1971 it informed D.I. that it had discussed an alternative milk supply of an unspecified quantity with NFO. D.I. informed Sealtest that it was not interested in being a partial supplier and warned that it would refuse to sell any milk to Sealtest if the NFO milk was purchased. In response to this Sealtest, on two days notice, replaced D.I.'s entire supply of raw milk, and purchased no more raw milk from D.I. before going out of business in 1973.

(d) *Broughton Company* : Since 1968 D.I. and predecessor cooperatives had supplied Broughton the entire raw milk requirements for its Lexington, Kentucky plant. On or about April 20, 1971 Broughton advised D.I. that, beginning May 1, it would accept approximately 40 percent of its total raw milk requirements from NFO. Broughton apparently gave D.I. no prior notice of this substitution and, on May 1, returned three of the four tankers of milk it had ordered from D.I. On May 2, 1971 NFO began supplying all of the requirements of the Broughton-Lexington plant, and no subsequent purchases have been made from D.I. members.

(e) *Pet-Jackson* : In 1969 the defendant, which was supplying approximately 55 percent of the fluid milk needs of the Pet-Jackson plant, notified that plant that it would cut off its supply if Pet-Jackson did not agree within thirty days to purchase its full supply from the defendant. D.I. claims that it made the threat because of the Pet plant's tactics of periodically reducing its purchases from D.I. with little notice and of turning away split loads of milk tendered to it by the defendant. The threat was never carried out, since negotiations between the defendant and Pet-Jackson resulted in an oral agreement wherein Pet-Jackson was allowed to continue buying milk from certain other producers. Pet-Jackson eventually ceased purchasing any milk from D.I., and purchases none from them at present.

(f) *Mayfield Dairy Farms* : The Mayfield incident primarily involved extended nego-

tiations on service charges and on how Mayfield's supply needs would be divided between the defendant and certain independent producers. Mayfield Dairies purchased approximately 50 percent of its fluid milk from D.I. and 50 percent from independents. In September 1970, D.I. gave Mayfield thirty days to consider entering into a full-supply contract, later extending this time to December 1970. As a result of negotiations between the parties, it was finally agreed that Mayfield would pay service charges equaling approximately two-thirds of the amount which had been asked for by D.I. In addition, Mayfield agreed not to take on any *additional* independent producers as sources of supply over the amount being supplied by the independent dairy farmers then selling to Mayfield. However, Mayfield maintained these existing independent sources under the agreement's "grandfather clause."

### (3) Written Supply Contracts

The defendant contends that it was these frustrating experiences with processors that led its Board of Directors to authorize D.I. managers to seek written sales agreements for transactions between the members and fluid processor customers.[14] D.I.'s marketing department drew up a form contract and, during the summer months of 1971, this contract was presented to each fluid processor customer regulated on a federal order. The plaintiff complains about several terms in the contract, but the main contention centers on the contract's supply provision.

The original proposed contracts were termed "full supply" contracts, requiring the customer to purchase from D.I. all of its needed supplies of raw milk, except for those then being provided by other "grandfathered" suppliers.[15] The proposed contracts were to run for a term of one year, with the term beginning in the fall months when the farmers' bargaining strength was highest. Doctor Albert J. Ortego, Jr., the defendant's vice-president of marketing, explained that the "grandfather" provision was inserted because D.I. wanted to start off under the contract from where things were right then, meaning that generally speaking, D.I.'s customers to whom the contract was being presented were at that time receiving their full supply from the defendant, and D.I. wanted to go for a twelve-month period. "We didn't want to kick nobody [sic] else out but we didn't want to sell him no [sic] less milk either." Doctor Ortego testified further that this was a fully negotiable provision; that D.I. did not expect to "get that with everybody" and that D.I. fully expected that many would not accept the provision and that D.I. would have to sit down at the bargaining table and negotiate about it; that D.I. would ask for a full supply contract (modified by the "grandfather" provision) and failing to get that would settle for a committed supply agreement.

A number of Georgia processors did sign the original proposed contract promptly; others, like Kinnett, refused to sign. Two processors, Holland Dairies and the Borden Company, sought and obtained Temporary Restraining Orders against the defendant for activities which occurred as a result of a dispute over this full supply requirement.[16]

14. The disputes discussed, *supra*, occurred when D.I. and these processors had only oral agreements. D.I. claims that the processors' unilateral abrogations of these "handshake" agreements is what prompted D.I. to seek written supply contracts.

15. Because of this grandfather clause, these original contracts cannot be characterized as *true* full supply contracts.

16. *Holland Dairy Products Co.*: In July 1971, D.I. was supplying approximately 90 percent of the raw milk needs of Holland's regulated processing plant at Holland, Indiana, and was also supplying the Holland manufacturing facility at Tell City, Indiana.

D.I. and Holland had an ongoing dispute concerning the proper amount owed D.I. members for milk it had supplied Holland. The difference amounted to between $50,000 and $60,000. When D.I. presented Holland with a written sales agreement in late July 1971, Holland found a number of the provisions of the proposed contract to be unacceptable, and so advised D.I. D.I. advised Holland that if Holland did not wish to enter a written supply agreement, D.I. had other markets for its members' milk. Negotiations between the parties stale-

Because of these problems with processors over the full supply terms, D.I. entered negotiations with several processors, and together they developed an alternative supply provision.[17] This provision committed the customer to purchase, and D.I. to supply, specified quantities of raw milk each month for a year. The plaintiff never signed a full supply contract and did not sign the "committed supply" contract until January 12, 1972, making it the last Georgia processor to sign a written sales agreement.

### (4) Supply Cut-Offs

(a) *Kinnett.* In 1973, a number of factors converged to cause a substantial increase in the cost of milk production.[18] At the same time, the quantity of milk production was decreasing. Because of this combination of circumstances, D.I. approached its handler customers, stating that higher prices were needed for milk at the producer level or a shortage of milk production was

bound to result. D.I. proposed to amend the sales agreements it had with the handlers in order to obtain the suggested increase of $.73 per cwt, thus raising the price of Class I milk from $8.13 per cwt to $8.86 per cwt. All of D.I.'s customers agreed to this "Supplemental Agreement" when presented except Kinnett. Kinnett and D.I. had discussed the proposed price increase, and these discussions had led Frank McDowell, Jr., D.I.'s Georgia manager, to believe that Kinnett understood the difficult situation of the dairy farmers and would agree to the proposed price increase. However, at 3:30 p. m. on July 30, 1973, only a day before the scheduled increase was to take effect, Kinnett dispatched a letter by courier from Columbus, Georgia to Decatur, Georgia to inform D.I. for the first time that it intended to oppose the price increase. Kinnett refused to agree to this price increase unless D.I. would assure it that *all* of any price increases would be passed on to the cooperative members. D.I.

mated on August 30, 1971 and D.I. consequently reduced its September 1, 1971 deliveries to Holland by 10,000 gallons, a quantity roughly equal to Holland's daily Class II needs. At this time Holland sought and obtained on September 3, 1971 a Temporary Restraining Order to compel D.I. to resume supplying Class II milk to the Holland plant. Within a short time, the parties reached agreement on a written contract in the form of a "specified volume agreement."

*Borden Co.*: D.I. presented Borden's plants, along with all other customers, with written (full supply) contracts during the summer of 1971. While D.I. was attempting to negotiate with Borden for the written supply agreement, Borden cut off its entire supply of D.I. member milk at its Lexington, Kentucky plant. At the same time, Borden's Jackson and Meridian, Mississippi plants began replacing their D.I. supply with other sources of milk, sometimes refusing to accept D.I. member milk which they had orally agreed to purchase. (It should be noted that at least with Borden, there was an appreciable disparity in bargaining position, Borden being of much greater "financial stature" than the defendant). D.I. felt that the cut-off by Borden was unfair because it was done without notice. The defendant felt it necessary to get Borden's attention in order for Borden to sit down at the bargaining table and discuss a written supply agreement (Borden had a habit of stalling, or just refusing to talk to the defendant). As a result, on September 1, 1971, D.I. notified Borden that it would be discontinuing its supply of milk to the Borden-

Meridian plant. However, D.I. resumed its supply to the plant after only one day because Borden sought and obtained the Temporary Restraining Order requiring D.I. to do so. The parties then met to negotiate a mutually acceptable written contract, and finally agreed to a contract which required D.I. to supply and Borden to purchase specified percentages of their raw milk supplies, and which required Borden to reduce unneeded supplies on a pro rata basis. This agreement was made a part of the order dissolving the Temporary Restraining Order and stated in part: "During any month in which Buyer's need for processing at Buyer's plant is less than the amount [shown on Exhibit A] for such month, the Buyer shall reduce its purchases from seller *and other suppliers* by diversion *on a pro rata basis.*" (emphasis added)

17. Testimony of Ben Morgan, Jr., Executive Vice President and General Manager of D.I., indicates that the defendant was not taking an uncompromising position in the negotiations: "Naturally, I tried to sell them on full supply milk, and when I couldn't sell them on full supply, I tried to sell them on a partial supply."

18. Beginning in late 1972 and continuing through the summer of 1973 there was a severe drought in the eastern United States. This caused feed and grain production to decline. In addition to the drought, sales of grain to Russia caused increased prices for feed.

considered this to be an attempt to intrude into the dairy farmers' decision-making process and rejected it.

The written sales agreements D.I. had with its customers gave any contracting customer the right to the most favorable terms of trade received by any other customer. Thus, Kinnett's refusal jeopardized the supplemental agreement with other D.I. customers and the price increase they had agreed to allow.

On August 2, 1973, D.I. refused to deliver milk to Kinnett except at the increased price then being paid by its other customers. Kinnett refused to accept the milk at that price unless the acceptance was "without waiving any right as to the price of future sales and without waiving any right under the written Sales Agreements." D.I. attached a notice to its delivery ticket requiring Kinnett to agree that acceptance of milk on that day would constitute acceptance of the higher price. When Kinnett refused to sign the delivery ticket unless D.I. signed the non-waiver statement, D.I. drove its truck away. As a result, Kinnett instituted the present litigation and obtained a Temporary Restraining Order requiring D.I. to continue selling milk to Kinnett at prices established by the contractual formula until the contract expired. During this period, the higher price was being paid by all other Georgia customers of D.I.[19]

(b) *Borden.* A more recent dispute occurred between D.I. and Borden, Inc. concerning supplies to Borden's Macon, Georgia plant. It occurred at a time when Borden was a full supply customer and the parties were operating under an oral agreement and were engaged in a series of discussions regarding price credits which Borden was requesting and D.I. was considering for milk Borden was selling from its Georgia processing plants into South Carolina. On March 25, 1977, at the peak of the spring surplus season, the manager of Borden's Macon plant advised D.I. that Borden intended to replace approximately 25 percent of the plant's D.I. milk in three days. D.I. responded by advising Borden that it considered three days notice at the peak of the flush season to be unreasonable, and that if Borden elected to replace D.I.'s milk it could replace *all* of it at its Macon plant and its Augusta, Georgia plant as well. Borden then instructed D.I. to cease all deliveries at Borden's Meridian, Mississippi processing plant. D.I. initiated litigation, charging that Borden's three-day notice of the change in supply arrangements was not commercially reasonable notice as required by the Uniform Commercial Code. An injunction directing Borden to continue purchasing its milk from D.I. was issued. Forty days later Borden succeeded in having the injunction dissolved on the ground that a commercially reasonable time had passed since its initial notice to D.I. It immediately replaced all D.I.'s milk at its Macon plant. Borden-Augusta ultimately reduced its purchases from D.I. from 100 percent to approximately one-third of its needs between March 1977 and August 1978.

### (5) Hauling Cut-Off

Until 1970, Kinnett hauled the milk of each of the farmers supplying it from their farms to the Kinnett plant. This included D.I.'s members as well as Kinnett's independent processors. It preferred this arrangement because the hauling operation was profitable and because Kinnett believed it could better ensure the quality and flavor of the milk in this way. On March 4, 1969, D.I.'s predecessor, GMPCA, adopted a policy of hauling the milk of GMPCA's own members to market, and in February 1970 GMPCA told Kinnett that as of April 1, 1970 Kinnett would no longer be permitted to haul the milk of GMPCA members. The general manager for GMPCA, Frank H. McDowell, Jr., advised Kinnett in effect

---

**19.** In recognition of the economic conditions urged by D.I. as necessitating the price increase, the Secretary of Agriculture took steps immediately raising the minimum price by $.40 per cwt. and putting the increase in effect immediately, rather than awaiting the customary two-month lag. Also, shortly after the President froze all prices (July 1, 1973), he exempted all raw agricultural products, including dairy products, from the freeze, thus permitting processors like Kinnett to pass on their increased costs to their customers.

that the reason it was at that particular time implementing, as to Kinnett, that hauling policy was because Kinnett's employees were successfully attempting to convince GMPCA members to leave the cooperative. In addition, there was concern about mixing member and nonmember milk in the same tanker, i. e., quality control problems. D.I. did not merge with GMPCA until September of 1970, after GMPCA had taken over Kinnett's hauling. However, after the merger D.I. adopted the GMPCA hauling policy and continued the transformation from processor hauling to cooperative hauling. GMPCA did not treat Kinnett differently from the way it treated other processors hauling cooperative members' milk for their own account. It took over the hauling of Pet, Inc. at Waycross in November 1969. It took over both Pet's Washington, Georgia plant and Kinnett on March 31, 1970. The evidence does not disclose that any hauler was permitted to continue hauling if GMPCA, or later D.I., learned of the hauler's attempting to persuade the cooperative members to leave the co-op. Other haulers, specifically Vernon Sanders and Jack Edwards, have had hauling arrangements with D.I. terminated as a result of attempts to influence co-op members to leave their co-op.

## IV

### FACTUAL BACKGROUND AS TO SHERMAN ACT SECTION 2 CHARGE

 The offense of unlawful monopolization consists of the possession of monopoly power *and* the element of deliberateness or general intent or purpose to acquire, use or preserve such power.[20] Monopoly power, the first element to be proven in a monopo-

lization charge, is that power to control prices or exclude competition.[21] To determine whether or not it exists, it is first necessary to define what is the "relevant market" in which this power over prices and competition is to be tested. The relevant market consists of both a product market (the product or services affected) and a geographic market (the area within which trade may be limited).[22]

### A. Facts Relating to Product Market.

In the present case, there is dispute as to whether the relevant product market is *all* milk as the defendant contends, or only Grade A milk, as the plaintiff contends. The term "Grade A" means raw (unprocessed) milk which has met specified state sanitation, health, and quality standards, and is therefore available for sale for human consumption in *fluid* form.

Producers in the industry are recognized as either Grade A or Grade B. Grade A producers generally receive more for their milk than Grade B producers. To be a Grade A producer, a farmer must meet the standards mentioned above with respect to both production and storage. These standards are much more strict with respect to Grade A milk than Grade B. In addition, production of Grade A milk requires a higher initial capital investment than Grade B production, e. g., installation and refrigeration of bulk tanks for storing milk on the farm. Consequently, a producer does not simultaneously produce Grade A milk and Grade B milk from the same facilities.

Grade A milk is distinguishable not only in terms of who produces it, but also in terms of who its customers are. A customer (processor) who processes milk into both fluid and manufactured form at one location can, for sanitation reasons, receive only

---

20. See, United States v. Grinnell Corp., 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); United States v. Aluminum Co. of America, 148 F.2d 416 (2nd Cir. 1945); United States v. United Shoe Machine Corp., 110 F.Supp. 295 (D.Mass.1953) aff'd per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954); cf. United States v. Griffith, 334 U.S. 100, 105–06, 68 S.Ct. 941, 944–45, 92 L.Ed. 1236 (1948).

21. United States v. Grinnell Corp., supra, at 571, 86 S.Ct. at 1704; United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); United States v. Griffith, supra, at 105, 68 S.Ct. at 944.

22. Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

Grade A into its plant. Also, only handlers receiving Grade A milk from producers are subject to regulation under federal milk marketing orders.

Grade A milk is generally recognized in the industry as a distinct product and line of commerce for fluid consumption, even though it is true that Grade A milk can be used for both fluid *and* manufacturing purposes. This is so because whatever interchangeability there is is one-way; i. e., though Grade A milk may be used for Class I, II or III purposes, Grade B milk can *never* be used for Class I (fluid) purposes. It should be noted that D.I. itself has a separate division, D.I. Manufacturing, Inc., to deal with manufactured milk products which can be made from Grade B milk.

### B. Facts Relating to Geographic Market.

The second component of the relevant market is the geographic market—that physical area in which sellers of the particular product operate and to which purchasers can practicably turn for such products.[23] It is the plaintiff's contention that the relevant geographic market is the FMO–7 area, which has the same boundaries as the state of Georgia, except for eight counties in the extreme northwestern corner of the state traditionally associated with the Chattanooga market and one in northeast Georgia, or alternatively the area covered by nine of the sixteen federal orders under which D.I. operates. The defendant, however, contends that the relevant geographic market encompasses an area much larger than the state of Georgia, including either (1) all states east of the Rocky Mountains, (2) nineteen states in which it markets milk, (3) fourteen states in the southeast in which it markets milk and has members, or (4) at the very least, Georgia *plus* the surrounding states of Alabama, Tennessee, North Carolina and South Carolina.

### (1) The Area in Which Seller Operates

As for the first prong of the geographic market definition, that area in which the seller operates, the evidence in the present case shows that D.I. has members in fourteen southeastern states and markets its members' milk in an even wider geographic area. When D.I. was formed in 1968 it took over eight cooperatives located throughout the southeastern states. Its operation extended into Virginia, Louisiana, Kentucky, southern Illinois, and Mississippi. Since 1968 producers in the additional states of Alabama, Georgia, Missouri and Florida have become members of D.I. Its operations have extended also into southern Indiana, Tennessee, parts of West Virginia, North Carolina and South Carolina. In addition, D.I. occasionally markets milk in Ohio, Maryland, Washington, D.C. and Puerto Rico.

### (2) The Area to Which Buyer Can Practicably Turn

In determining whether the plaintiff could practicably turn to an area outside of the FMO–7 area for a source of supply, it is necessary to consider evidence on several points, including the nature of milk and its movement in general, where the plaintiff attempted and succeeded in purchasing milk, and the concepts of down allocation, compensatory payment, and base plan.

Raw milk is a perishable product which is subject to bacterial contamination within hours after it is produced. This bacteria growth which can render milk unsuitable for fluid use is a function of time and temperature. Until recently, this time factor prohibited the movement of milk over any appreciable distance. However, two factors have combined to make long distance movement of milk feasible; they are the completion of the interstate highway system and technological advances in storage and hauling facilities. As a result, milk can move and is being moved long distances. For example, studies of bulk milk shipments for 1975 showed that the average distance was 350 miles. About 40 percent

---

**23.** *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 627, 5 L.Ed.2d 580 (1961).

of the shipments were for distances of less than 200 miles, 30 percent were for distances of 201 to 400 miles, 25 percent were for distances of 401 to 700 miles and 5 percent were over 700 miles.

In addition to the evidence of the movement of milk generally, Kinnett's own purchases support the argument for a relatively broad geographic market. During the period from 1968 to the present, Kinnett searched for and actively negotiated with numerous raw milk sources outside Georgia. Some of these attempts to purchase milk were successful; others were not. For example, Kinnett purchased approximately one-half of its raw milk requirements from Tennessee between May 1968 and December 1970 and 20 percent of its supply from Alabama between March 1975 and November 1977. In September 1979 Kinnett began to purchase raw milk supplies from Alabama Milk Producers (AMP), Southern Milk Sales, Inc. and Southern Bell Dairies. This milk is produced in Alabama, Tennessee and Kentucky and comprises over one-half of Kinnett's supply. It has, since September of 1979, completely replaced D.I.'s milk in Kinnett's plant. In addition to the above-mentioned purchases, the plaintiff made other, less substantial out-of-state purchases from 1968 to 1979. These purchases were from Nashville and Chattanooga, Tennessee; Louisiana; Mississippi and, in a couple of instances, from Minnesota.

### (3) Down Allocation, Compensatory Payments and Base Plan

Three other factors to consider in determining that area to which the plaintiff can practicably turn for its milk supply are the concepts of "down allocation", "compensatory payment" and "base plan". The plaintiff contends that these concepts operate to erect a barrier around the FMO–7 area and, by this isolation, make it the relevant geographic market in the present case.

Plaintiff contends that these three concepts impose a regulatory "tax" upon the importation of milk from outside the market order area, explaining, however, that tax must be put in quotation marks because it is not really a tax—"It is just [that] the operation becomes taxing so to speak"; that it raises the cost to the handler and the proceeds of the costs are distributed to the producers in the importing market. The experts explain that the regulatory tax applies only to interhandler shipments like from Sealtest in Chattanooga to Kinnett in Columbus, and that it does not apply to producer milk that goes into an area. This interhandler regulatory tax is broken into two categories: (1) if the interhandler shipment originates in one *regulated* area and goes into another, we have the "down allocation" of some of that shipment to Class II, and (2) if the shipment originates in an *unregulated* area and moves into a regulated area, we have the down allocation just mentioned, plus a "compensatory payment" levied on any of the milk that is not down allocated. In these interhandler shipments the shipper usually has more milk than it needs and the purchaser can buy it at a cost lower than its local prevailing price. This regulatory tax fluctuates—the higher the Class I utilization rate goes, in other words, the lower the surplus is, the lower the regulatory tax. This is designed to encourage milk movements only when needed for Class I use and to provide disincentives for milk flows between markets unless there is in fact a true shortage.

The term "down allocation" is not used in the FMO–7 but the experts explain it this way. Under the federal order marketing system, Class I prices vary from zone to zone by addition of the mileage increment as we come south. Thus, if Kinnett brings down from Chattanooga a tanker of Class I milk it would be paying in effect the Chattanooga Class I price for that milk in Chattanooga, plus the transportation costs to Columbus and that would be approximately equal to the Columbus Class I price for the milk. But under the regulatory tax system the administrator is going to require Kinnett to treat that load of milk as part Class I and part Class II, the Class I amount being the percentage of milk in Kinnett's plant that is Class I, or the percentage of milk in the entire FMO–7 area that is Class I whichever is lowest. The remaining por-

tion of the load is allocated down to Class II—hence the term "down allocation". The significance of this down allocation is this: Class II prices do not vary between orders. They are the same everywhere. It is not contemplated that a processor will haul Class II milk great distances to manufacture it into cheese, for instance. That would be what the esoterics refer to as "hauling the water." It is more economical to utilize the Class II milk wherever it is and then transport the cheese, for instance, at lesser transportation costs. The Class II price in Chattanooga being the same as it is in Columbus, Kinnett is going to have to pay transportation costs over and above the Class II price in Columbus for that down allocated Class II milk. If the applicable utilization rate is 80 percent Class I and 20 percent Class II, this means that Kinnett must be deemed to have used only 80 percent of the shipment for bottling and the other 20 percent for the ice cream line though he may have actually used all of it for bottling purposes. The experts say that this means that Kinnett is going to have to pay the local producers for that additional 20 percent at the Class I price.

As noted these regulatory tax factors do not apply to producer milk and do not deter producers in one state from dealing with processors in another. For example, in 1975 about 20 percent of the milk pooled on the Georgia order was produced outside Georgia and was subject to no regulatory tax. When the down allocation does apply, the only thing involved is the transportation costs from one point to the other. To the extent there is down allocation this means only that such imported milk will have the same utilization percentages as the milk of the producers regularly supplying the Georgia regulated plants, and any disadvantage to the handler from receiving other order milk occurs only when transportation costs exceeds the blend price difference between the shipping order and the receiving order.

The "compensatory payment" above mentioned applies only to unregulated milk, that is, milk which is not priced under the federal order system. This means that the handler can buy the milk at any price. The compensatory payment means only, according to the experts, that the system is treating the unregulated milk in such a way that it does not receive better treatment than producer milk.

Georgia producers have a Class I base plan which followed in time their seasonal base plan. The purpose of the seasonal base plan was to influence producers to produce milk when it was most needed and to produce less at other times. A number of federal orders have such plans. The Class I base plan had the same purpose and also tried to control the total amount of milk produced in the order area. It succeeded in influencing the seasonality of production by evening it out but did not succeed in controlling production. Production in Georgia increased after the institution of the Class I base plan. There are quite liberal and practical provisions in the order for acquisition of Class I bases by new producers whether they are located within or without the order area.

Under the federal order classified pricing system each order defines a "marketing area" which is the geographically defined area within which if a processor/handler makes a specified percentage (15 percent in the "Georgia Federal Order," FMO–7) of fluid milk sales (called "in area fluid route disposition" or "route sales" for short), he becomes subject to price regulation under the order. The marketing area may indicate less, all or more than one state.

Because handlers operate their businesses through plants, these orders in practice regulate the plants of the handlers. Thus the plants having the required in area fluid disposition are called fully regulated pool plants. Under certain conditions, plants which produce no fluid products but which sell specified percentages of milk to distributing plants or meet other requirements may be pool plants as well. Federal orders directly regulate handlers—not producers—though producers—not handlers—decide whether to petition for a federal order. Federal orders do not guarantee producers a market—only a minimum price.

The federal orders do not directly regulate the location of the farms producing the milk or direct where the milk shall be sold. They do not directly regulate the location of the handler or its plant facilities. The marketing area of an order is only the geographic area in which the handler must make a specified percentage of sales of fluid milk products in order to become subject to the regulations of the order.

This is not to say that there is no connection or relationship between the order and the location of the dairy farms and the location of the handlers purchasing the milk. The producers in petitioning for a federal order ask the government to define an area that includes their nearest direct competitors and their major processor outlets. So it is that most of the milk processed in the FMO–7 area is, in fact, produced there and *vice versa*, and the same is true with respect to D.I.'s overall territory. Classified pricing was designed for two purposes—to maintain an adequate supply of milk by means of prices high enough to encourage local production, and to prevent disorderly marketing conditions as in cases of price war activity.

### (4) The "Submarket" Contention

The plaintiff concedes that there is a price interrelationship between all, or substantially all, of the federal order areas east of the Rocky Mountains which may be enough to consider—from a highly analytical, economic viewpoint—those areas taken together to be a relevant geographic market. However, the plaintiff contends that the practical ability to transport milk for regular supplies within that area is in fact minimal. Consequently, Kinnett does not see it as a viable alternative to FMO–7 as the relevant geographic market.

With respect to the FMO–7 area (Georgia), plaintiff contends that it is the relevant geographic market. Plaintiff contends further, however, that even if it is too small to be considered the geographic market, and even if some larger area should be determined to be the relevant geographic market, nevertheless this smaller area qualifies as a, or the, relevant geographic *sub* market. This contention will be discussed *infra.*

Plaintiff also suggests nine federal order areas included in D.I.'s marketing territory [24] as either the relevant market—or at least as a submarket of the federal order areas east of the Rockies. The plaintiff contends that because federal order areas generally share a number of common marketing conditions, Georgia processors would therefore normally look to these areas—particularly the ones to the north and northwest of Georgia which are in D.I.'s territory—as the most likely alternatives to Georgia supplies of raw milk.

The defendant cites what it considers to be several defects in the plaintiff's proposed submarket argument. The first is that the submarket fails to include seven additional federal orders in which D.I. markets milk,[25] all of which are within a 1,200 mile range considered "feasible" to transport milk.[26]

---

**24.** These orders are: FMO–46 (Louisville/Lexington/Evansville); FMO–7 (Georgia); FMO–101 (Knoxville); FMO–11 (Appalachia); FMO–99 (Paducah); FMO–90 (Chattanooga); FMO–98 (Nashville); FMO–103 (Mississippi); and FMO–94 (New Orleans).

**25.** These orders are: FMO–4 (Middle Atlantic); FMO–6 (Upper Florida); FMO–13 (S.E. Florida); FMO–32 (Southern Illinois); FMO–33 (Ohio Valley); FMO–96 (Greater Louisiana); and FMO–97 (Memphis).

**26.** Albert E. Scott, a representative of NFO and a witness summoned by Plaintiff to testify through prior trial testimony from *United States v. Dairymen, Inc.,* 1978–2 Trade Cases ¶

62,186 at 75,305, testified that raw milk can be moved 1,500 miles and retain high quality:

Q And if the milk is so, if the tanker is so pre-cooled and sanitized and you put high quality milk in it with a temperature of about 34, 35 degrees, there is no problem moving that milk as much as 1,500 miles, is there?
A Milk can certainly be moved that far and remain good quality.
Q And does that move that far all the time?
A And does move that far, yes, sir.
* * * * * *
Q So it is not unusual for milk to move great distances today because of the way it is handled?
A Yes, sir, that is correct.

In addition, Kinnett has not included the states of North Carolina, South Carolina and Alabama in its proposed submarket—even though D.I. members reside, produce and market milk in those states—because milk sales in those states are regulated by state law. The defendant contends that exclusion of these market areas and states from ·the alternative relevant geographic market or submarket is not permissible under the facts.

In responding to the plaintiff's submarket argument, D.I. also offers some alternative relevant geographic markets. It contends that the evidence supports a determination that the relevant market is either .D.I.'s fourteen state marketing territory or Georgia plus its adjacent states, other than Florida, which is not considered a practicable source. According to the defendant, this comports with the reality of the way in which D.I. built and conducted its business, and is the better identification of that "market area in which the seller operates." [27] In addition, as noted above, a substantial portion of bulk milk movements, approximately 25 percent, are movements which cover between 400 and 700 miles, an area roughly coincident with D.I.'s fourteen state marketing territory when viewed from Atlanta.

## C. Facts Relating to Market Power.

After the relevant product and geographic market has been defined, the court must determine what degree of market power the defendant possesses in that market. The primary indicator of market power is what share of that market the defendant has.[28] There are no static ranges of permissible and impermissible market share. "The relative effect of percentage command of a market varies with the setting in which that factor is placed." [29]

### (1) Defendant's Share of the FMO–7 Area

D.I.'s share of the Georgia marketing area has ranged from a high of 75 percent in 1970 to a low of 58 percent in 1979. The plaintiff claims, however, that these figures grossly understate D.I.'s effective market share and its actual market power because D.I. and the other Georgia-based cooperatives all collaborated in the Georgia Super Pool which funneled all milk sales to third parties through D.I. The combined market share of the Georgia Super Pool, including D.I., ranged from a high of at least 90 percent to a low of 65 percent, and according to U.S.D.A. calculation, the 90 percent share was maintained at least through 1975. Because the Super Pool members operated a single business unit, Kinnett claims that these shares are more accurate indicators of D.I.'s market power in Georgia than D.I.'s share alone, and consequently, that D.I. effectively controlled the price of all of the cooperative milk in Georgia—75 percent to 90 percent from 1969 through 1973, and at least 65 percent in the years since 1973.

The defendant claims that Kinnett's attempt to tack the market shares of the other member cooperatives of the Georgia Super Pool onto D.I.'s share is factually unsupportable and legally .impermissible. D.I., as agent for the other members of the Super Pool, does not control these other members' milk. Each co-op member operates (or operated) a processing plant which

Q And particularly in the Fall of the year milk moves in large quantities from the north into the deficit areas here in the south, your region?
A It certainly does during the Fall of the year, there is a movement of milk, yes, sir. Scott U.S. v. DI Tr. 951–52.

27. *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. at 327, 81 S.Ct. at 627.

28. *United States v. Griffith*, 334 U.S. 108 at n. 10, 68 S.Ct. 946 at n. 10.

29. *United States v. Columbia Steel Co.*, 334 U.S. 495, 527–28, 68 S.Ct. 1107, 1124–25, 92 L.Ed. 1533 (1948). In *Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, 974 (8th Cir. 1968), cert. denied, 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969), the court noted that monopolization has never been found when the percentage of the market is below 70 percent. In *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 n. 2 (5th Cir. 1969) the Fifth Circuit indicated that "something more than 50 percent of the market is a prerequisite to a finding of monopoly."

processed its members' milk into fluid products and most also utilized their members' milk in small scale manufacturing operations. The Super Pool Agreement established GMPCA and later D.I. as the common marketing agent for milk *in excess* of these *plant* needs. Thus, the only milk which D.I. as agent might be said to have controlled is that *surplus* milk actually turned over to it for marketing, a quantity which the defendant contends has been inconsequential.

As for its own market share of the Georgia federal order, D.I. acknowledges its 73 percent control in 1971; however, it points out that even at this peak level, D.I. members' share of the market was thus below the 75 percent market share government antitrust experts believe to be the minimum necessary for a cooperative to control prices effectively. In addition, the defendant notes a consistent decline in D.I. members' share of the market from 1972 until 1979: 1972—69 percent, 1973—66 percent, 1974—63 percent, 1975—60 percent, by 1978—59 percent, and in 1979—58 percent.

### (2) Defendant's Share in Each of its Four Proposed Alternative Markets

The defendant offers four alternative relevant geographic markets. In the one D.I. considers the most relevant, the area east of the Rocky Mountains, it marketed approximately 5 percent of all milk marketed in that area and about 6 percent of all the Grade A milk marketed. In nineteen of the states east of the Rocky Mountains which comprise at least a portion of the supply area for the southeastern United States, D.I.'s share of the total Grade A milk production was between 8 percent and 13 percent. The plaintiff's response to these statistics is two-fold. First, the plaintiff opposes their use because they are based on D.I.'s market share in the *wrong* geographic area. Second, the plaintiff complains that these figures are, like those on D.I.'s Georgia market share, an understatement of its

true market power, because of the joint activity of D.I. and other cooperatives in that area in fixing prices and neutralizing competition.

The defendant's third alternative relevant market is the thirteen states where D.I. members produce milk.[29a] Its aggregate share of the total milk production in that area for the period from 1971 through 1979 ranged from a low of 23.5 percent in 1973 to a high of 25.5 percent in 1976. When only Grade A milk is considered, D.I.'s aggregate share did not exceed 30.2 percent in any of the same years in this area. The plaintiff's criticism of these statistics is the same as that offered against the "east of the Rocky Mountains" statistics.

The defendant contends that the *smallest* possible relevant geographic market is Georgia and the adjacent states of South Carolina, North Carolina, Tennessee and Alabama. D.I.'s market share of the total milk production in this area between 1971 and 1979 was between 35.5 percent and 38.9 percent. Its aggregate share of the total Grade A volume in these five states for the same period did not exceed 42.4 percent for any year.

### (3) Defendant's Share in Plaintiff's Proposed Nine-Federal Order "Submarket"

The plaintiff contends that, within its proposed nine-federal order "submarket", D.I. has had a significant market share for the relevant period of time to constitute monopoly power. In the nine federal orders listed, its market share ranged during the period from 1969–1975 as follows: Order No. 46—89 percent to 74 percent; Order No. 7—72 percent to 60 percent; Order No. 101—98 percent to 99.6 percent; Order No. 11—99 percent to 98 percent; Order No. 99—100 percent to 85 percent; Order No. 90—77 percent to 75 percent; Order No. 98—93 percent to 78 percent; Order No. 103—83 percent to 69 percent (date for this

**29a.** The state of Florida is not included in this alternative because, being a deficit area, it is not considered an available source.

order ending in 1973); Order No. 94—81 percent to 57 percent.

The defendant's response to this evidence is that it is "radically incomplete" in that it includes only a part of D.I.'s federal order area and no part of the state regulated marketing area. There are, for example, seven additional federal order areas in which D.I. markets its members' milk. If these seven are added to the nine listed by Kinnett, D.I. would have a combined market share of only between 28 percent in 1971 and 22 percent in 1979. Additionally, as to the nine listed, they show a steady decline in D.I.'s market share, which D.I. contends demonstrates the tenuous and transitory nature of market power.

## V

## CONCLUSIONS OF LAW AND APPLICATION OF THE FACTS TO THE LAW

■ Defendant D.I. is a nonprofit agricultural milk marketing association, all of whose members are dairy farmers. As such, D.I. is entitled to the benefits of the antitrust exemptions provided by Section 6 of the Clayton Act (15 U.S.C. § 17) and the Capper-Volstead Act (7 U.S.C. § 291). It is appropriate therefore to determine the extent of those exemptions.

Recurring agricultural depressions convinced the Congress that farmers needed congressional help. They had always been pricetakers, standing relatively helpless before those who would purchase their products. The Congress through Section 6 of the Clayton Act, as early as 1914, and more extensively through the Capper-Volstead Act of 1922, following the severe agricultural depression of 1920, deliberately set about to enable farmers to organize and band together in order to acquire and exercise marketing power comparable even to that of the sizeable corporate structures bargaining with them for their product. Section 6 of the Clayton Act specifically authorized "the existence and operation of . . . agricultural . . . organizations, instituted for the purposes of mutual help . . ." and the "lawfully carrying out [of] the le-

gitimate objects thereof" and ordained that "such organizations or the members thereof, [would not] be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws." Eight years later, to make the matter more specific, through the Capper-Volstead Act the Congress specified that "persons engaged in the production of agricultural products as . . . dairymen . . . may act together in associations . . . in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce such products . . . . Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes."

■ While price-fixing arrangements are generally held to be per se violations of Section 1 of the Sherman Act, *White Motor Co. v. United States*, 372 U.S. 253, 260, 83 S.Ct. 696, 700, 9 L.Ed.2d 738 (1963), no one would question today the right of farmers acting together in organizations or associations to fix the prices they agree to charge for their products. It is now fast becoming clear also that cooperatives of farmers may unite into associations which may perform marketing functions and which may have "marketing agencies in common." In other words, cooperatives may co-operate or associate or federate with other cooperatives, among themselves, and still enjoy the exemptions provided by these statutes. Such activities on the part of such cooperatives acting separately or collectively do not constitute contracts, combinations, or conspiracies in restraint of trade in violation of Section 1 of the Sherman Act, nor, though the purpose of such cooperative efforts and activities be the acquisition of as much market power as possible, do they constitute monopolizing or attempts to monopolize, or combinations or conspiracies to monopolize in violation of Section 2 of the Sherman Act subject only to the caveat with respect to both sections of the Sherman Act that such activities must be confined to farmers and their organizations and not include "outsid-

ers," [30] and must not include "predatory" activities.[31]

■ We agree with the holding in *Fairdale Farms, Inc. v. Yankee Milk, Inc. et al.*, 635 F.2d 1037, at 1040, (2nd Cir., 1980), that "Capper-Volstead gives farmers the right to combine into cooperative monopolies. The Act places no limits on combinations; it does not forbid farmers from combining after their cooperative reaches a certain size" and that while normally a firm is not permitted wilfully to acquire monopoly power,[32] that prohibition does not apply to agricultural cooperatives because "Capper-Volstead permits the formation of such cooperatives and places no limitation on their size. As the cooperative grows, so, normally, does its power over the market. Thus while the formation, growth and operation of a powerful cooperative is obviously a 'wilful acquisition or maintenance of such power', and will rarely result from a 'superior product, business acumen or historic accident,' it is exactly what Capper-Volstead permits." *Id.* at 1044, 1045. With equal clarity, *Fairdale* continues at 1045, "We conclude that *Grinnel!* does not apply to monopoly power that results from such acts as the formation, growth and combination of agricultural cooperatives, but applies only to the acquisition of such power by other, predatory means. It is not a violation of the Sherman Act for the members of an agricultural cooperative to carry out the

---

30. *United States v. Borden Co.*, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939).

31. *Maryland & Virginia Milk Producers Assn. v. United States*, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960).

The word "predatory" has unenviable connotations. In *Maryland & Virginia, supra*, the Supreme Court said that a Capper-Volstead organization could not "achieve monopoly by preying on independent producers." Webster's New International Dictionary, Second Edition Unabridged, 1953, defines the word "prey" in the intransitive sense as "to make a raid or raids for the sake of booty; to commit deprivations, to seize and devour prey . . . to commit violence or inflict harm in or through predaciousness; as cats prey upon robins; sharpers that prey on the poor", and in the transitive sense, "to plunder; pillage; rob; also to take as prey." The same authority defines predatory as "of, pertaining to, or characterized by, plundering, as predatory instincts; practicing rapine; given to plundering or robbery; plundering, pillaging; as, predatory excursion or party" and also "destructive, consumptive, injurious." One court conservatively remarked that "[t]he term [predatory] probably does not have a well-defined meaning in the context it was used, but it certainly bears a sinister connotation." *Telex Corp. v. International Business Mach. Corp.*, 510 F.2d 894, 927 (10th Cir. 1975). Professor Sullivan treats predatory conduct at some length as follows: "Predatory business conduct can be defined as conduct which has the purpose and effect of advancing the actor's competitive position, not by improving the actor's market performance, but by threatening to injure or injuring actual or potential competitors, so as to drive or keep them out of the market, or force them to compete less effectively. The earliest cases labeled predatory conduct as a violation of Section 2 when it was used to gain or hold monopoly power; the predatory monopolist became a figure in the national demonology."

"There has been much talk about predatory behavior, but few efforts to analyze it. Businessmen and judges think they know it when they see it. Economists tend to doubt that it occurs, at least very often, because it is likely to cost the firm using it more than can be gained from it."

. . . .

"[T]here will be something odd, something jarring or unnatural seeming about it. It will not strike the informed observer as normal business conduct, as honestly industrial." Sullivan, *Antitrust Law*, 108, 111–112 (1979).

There is a trend towards stretching the word predatory so as to let it include less pejorative conduct; for instance, conduct may be classified predatory if it evidences an intent unnecessarily (*see Greyhound Computer Corp. v. International Business Machines Corp.*, 559 F.2d 488 (9th Cir. 1977)); unreasonably (*see Sherman v. British Leyland Mtrs., Ltd.*, 601 F.2d 429 (9th Cir. 1979); *In re IBM Peripheral EDP Devices, etc.*, 481 F.Supp. 965, 1003 (N.D.Calif.1979)); or illegally (*see*, Blecher, *Attempt to Monopolize Under Section 2 of the Sherman Act: "Dangerous Probability" of Monopolization Within the "Relevant Market"*, 38 George Washington L.Rev. 215 (1969)), to exclude a competitor from a market. *See also, Union Leader Corp. v. Newspapers of New England, Inc.*, 180 F.Supp. 125, 140 (D.Mass.1959), where Judge Wyzanski seems to equate predatory practices with "unfair methods of competition, or business patterns not honestly industrial—in short, what may loosely be called unfair means."

32. *Grinnell v. United States*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

632

legitimate objectives of their association which follow naturally from their attempts to achieve unity of effort and the voluntary elimination of competition among themselves." *Fairdale Farms* is commended for its illuminating references to the legislative history of Section 6 of the Clayton Act and of the C–V Act, for its copious references to subsequent congressional enactments favoring farmers and expressing congressional concern over troublesome surpluses in farm products and for its thorough review of the limited but growing number of cases dealing with the scope and effect of Section 6 of the Clayton Act and of the C–V Act.

■ D.I. by fair and legitimate means may lawfully recruit as many farmer members as it can succeed in recruiting. This is true even though the combined production of the D.I. members represents a dominant share of the available milk production. The fact that this combined production might be considered "a monopoly" if it involved non-agricultural products, such as automobiles or coal, does not make D.I. subject to the antitrust laws applicable to other kinds of business. The acquisition and growth of market power by farmers through voluntary association in agricultural cooperatives is not only tolerated by the terms of the Capper-Volstead exemption, but is encouraged. Thus, even if D.I. has acquired a dominant share of any relevant geographic market in the supply of raw milk, D.I. has not exceeded the scope of its agricultural exemption.

■ D.I. as agent for its members may lawfully perform for them all of the tasks necessary to the processing, preparing for market, handling and marketing of their milk. This may include the collecting of milk at the farms of the members, testing the milk, hauling it to market, processing it for the market and its actual sale.

■ In marketing the milk of its members, D.I. may lawfully fix the price or prices at which the milk will be sold and, in seeking to obtain the best price for the milk, may exercise such market leverage as is afforded by managing in the market the combined production of its members. Thus, through D.I. its members can present a common, agreed upon price to milk buyers like plaintiff Kinnett even though similar conduct by private businessmen who are not farmers would be "price fixing" in violation of the antitrust law.

■ D.I., in marketing the milk of its members, may—as may an individual non-farmer businessman—refuse to sell to one or more individual customers provided D.I. does not have a monopoly of the milk, or having a monopoly, does not engage in a refusal to deal upon reasonable terms, such refusal being for the purpose of maintaining the monopoly. It necessarily follows that a cooperative like D.I. may refuse to sell to a purchaser that fails to meet any of the fair, reasonable and lawful terms or conditions set by D.I. for the sale. *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 374, 93 S.Ct. 1022, 1028, 35 L.Ed.2d 359 (1973); and *Town of Massena v. Niagia Mohawk Power Corp.*, 1980–2 Trade Cases ¶ 63,526 at 76,802.

A cooperative like D.I. may lawfully allocate certain territories for the sale of certain of its members' milk and other territories for the sale of other members' milk.

Not only do the individual dairy farmers acting together in D.I. enjoy the benefit of the Capper-Volstead exemption, but it is also enjoyed by D.I. in its joint endeavors with other associations which enjoy the exemption, either because they are themselves cooperatives like D.I. or because they are common marketing agents performing marketing functions for their cooperative members. These common marketing agents may perform the same function on behalf of their members as the members can perform on behalf of their farmer members, and D.I.'s members may voluntarily eliminate competition among themselves, and D.I. and the other similar associations with which it conducts joint endeavors can voluntarily eliminate competition among themselves. *Fairdale Farms v. Yankee Milk, Inc. et al., supra.*

 Even in the absence of the formal designation of a marketing agent in common, agricultural cooperatives like D.I. can act together through common marketing agencies or federations of cooperatives in processing, preparing for market, handling, marketing and pricing the members' products. Thus, cooperative dairy organizations can agree among themselves on prices they will charge for their products and can allocate sales territories and customers among themselves if this furthers the legitimate marketing purposes of the farmers, even though the antitrust laws may forbid other types of organizations from combining together in similar conduct. *See Fairdale Farms v. Yankee Milk, Inc. et al., supra.*

 The Georgia Super Pool, Great Lakes-Southern Milk (GLSM) and the Standby Pool (ADI or ARSPC) at all times relevant to this action were federated agricultural associations whose members were like D.I., Capper-Volstead cooperatives. The Georgia Super Pool, GLSM and the Standby Pool each acted as a common marketing agency for its respective members and as such each was entitled to the benefit of the Capper-Volstead exemption. Additionally, D.I. in its joint marketing activities with these marketing agencies and their members was entitled to the benefit of the Capper-Volstead exemption. *See, Fairdale Farms v. Yankee Milk, Inc. et al., supra.*

D.I.'s joint endeavors with the Georgia Super Pool, GLSM, the Standby Pool (and the members thereof) about which Kinnett complains were joint farmer marketing activities fully protected by the Capper-Volstead exemption. As such, and because they were not predatory in any sense of the word and did not involve outsiders, they are not acts in unreasonable restraint of trade prohibited by Section 1 of the Sherman Act, nor can they properly form the basis of a charge of monopolization, conspiracy to monopolize or attempt to monopolize prohibited by Section 2 of the Sherman Act.

 D.I.'s one-year written supply contracts and its other dealings with handlers including Kinnett were legitimate means by which D.I. marketed the milk of its members. In particular, the written contracts were reasonable in duration and were necessitated by the nature of milk marketing and the course of dealings between D.I. and its customers. They did not operate to substantially lessen competition or to unreasonably restrain trade and as such were necessary contracts fully protected by the Capper-Volstead exemption. The same is true with respect to the decision of GMPCA (D.I.'s predecessor) to terminate Kinnett's hauling of the milk of GMPCA members.

As stated *supra*, Section III B, plaintiff in its last brief groups together under seven headings certain types of conduct of defendant which plaintiff charges are predatory. The conduct referred to is the announcement of nonnegotiable premium prices unilaterally, cutting off plaintiff's profitable hauling operation, cutting off customers who tried to replace portions of D.I.'s supplies, warding off the entry of a potential competitor (NFO) into the Georgia market by cutting off or threatening to cut off defendant's supply to Sealtest-Atlanta in retaliation of Sealtest's attempt to obtain a portion of its needs from NFO, insistence upon full supply contracts, cutting off of plaintiff's supply August 1, 1973 and alleged efforts of defendant even after this action was filed, aimed at stopping Kinnett from receiving alternative supplies, including alleged continued threats not to deal with plaintiff (or to sell to it only at special supplemental prices), and alleged renewed insistence on year long committed volume contracts, this time contracts which contained no limit on the price D.I. could impose unilaterally. After careful consideration this court finds that under the circumstances none of the conduct complained of was predatory in any sense of the word.

The entire spirit of Section 6 of the Clayton Act and of the Capper-Volstead Act is its purpose to free farmers from the role of pricetakers and to enable them through joint action to agree upon, announce, and with some measure of assurance and confidence insist upon the agreed upon price for their product. It may be

observed that over-order pricing or premium pricing does not necessarily equate with "gouging". The United States government through the market order system does not purport to establish fair or reasonable prices—only minimum prices. The Department of Agriculture encourages producers through their cooperative organizations to bargain for fair and reasonable prices above the established minimum prices. Over-order and premium prices obtained throughout the nation. They are not peculiar to Georgia or the Southeast or to D.I.[33] In 1976, the National Consumer's Congress petitioned the Department of Agriculture to look into prices of milk as it is authorized to do under Section 2 of the Capper-Volstead Act in order to determine whether the price of any agricultural product is "unduly enhanced". The DA conducted such an investigation through a "Capper-Volstead Committee" whose lengthy report was filed in December 1976. In that report appear these statements: "With respect to the cost-price squeeze Dairymen, Inc. producers were in much the same position during the 1974–75 period as other producers throughout the country. Even though over-order charges in the D.I. markets were at record-high levels in late 1974, the amount of cash available after paying feed costs was at record-low levels." PX 524, p. 47.

"In the general area in which Dairymen, Inc., operates, at least five states (Alabama, North Carolina, South Carolina, Louisiana and Virginia) were involved during this period in establishing class prices to handlers. The Class I prices established by these states have been substantially above Federal order Class I prices and are more nearly in line with the cooperative's actual prices." PX 524, p. 47.

"There is no evidence of present undue price enhancement by any cooperative. Effective Class I prices are at or below the costs of alternative supplies . . . ." PX 524, p. 53.

With respect to plaintiff's complaint against the so-called full supply contracts, we are reminded that the Supreme Court in *Tampa Electric Co. v. Nashville Coal. Co.*, 365 U.S. 320, 333, 81 S.Ct. 623, 631, 5 L.Ed.2d 580 (1961), said: "It may well be that in the context of antitrust legislation protracted requirements contracts are suspect, but they have not been declared illegal per se. Even though a single contract between single traders may fall within the initial broad proscription of the section, [the section under consideration by the Court was Section 3 of the Clayton Act, 15 U.S.C. § 14] it must also suffer the qualifying disability, tendency to work a substantial—not remote—lessening of competition in the relevant market." The Court then observed that such contracts "may well be of economic advantage to buyers as well as to sellers" affording the buyer an assurance of supply and the seller the possibility of reduction of selling expenses, protection against price fluctuation and the possibility of a predictable market. It should be noted, however, that D.I. never sought full supply contracts. The contracts it sought contemplated and contained appropriate grandfather provisions. Furthermore, D.I. never insisted upon such quasi full supply contracts; it preferred them and asked for them but this preference and asking was negotiable and D.I. was ready to settle and frequently, if not uniformly, settled for a committed supply contract to which any processor would be hard put to raise objections since such contracts were bilateral and imposed upon D.I. the obligation to supply. The government admitted in the case of *United States of America v. Dairymen, Inc.*, 1978–2 Trade Cases ¶ 62,186 at 75,305, that the twenty-two committed supply agree-

---

**33.** *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, C.A. No. 75–140, D. Vermont, (Nov. 2, 1979) involved seven northeastern dairy cooperatives. The court there said: "In the northeast, both the Secretary of Agriculture and the state agencies regulate the price of raw milk by imposing floors under the price handlers must pay producers. Nevertheless in 1973 and 1974 producers faced rapidly increasing production costs that were not being met by rises in the regulatory floors. To protect their members from this cost-price squeeze, seven cooperatives formed RCMA which in September, 1973, set a price for its members' milk above the federal floor (the production incentive differential)."

ments were not inherently predatory, contending only that they were part and parcel of an attempt to monopolize. Actually because of the cyclical nature of milk production—its scarcity in some months and overabundance in others—and because of the propensity of some processors like Kinnett to purchase from D.I. only at times of scarcity and from their independent producers at times of overabundance, thus saddling upon D.I. the burden and responsibility of finding a market for the surplus milk, and at times the necessity to haul it to manufacturing plants in other states, there were solid business reasons for D.I.'s preference for grandfathered full supply contracts on a yearly basis thus covering one annual cycle, and for its insistence upon committed supply contracts thus requiring its purchasers to treat it equally with independent suppliers.

In the case of *Federal Trade Com. v. Motion Picture Adv. Co.*, 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426 (1953), the Supreme Court approved a determination by the Federal Trade Commission to the effect that exclusive contractual provisions extending for only one year were permissible under the antitrust laws.

The plaintiff complains further that several of the detailed provisions of the contracts were unduly restrictive upon the processor and even that their charges were sometimes duplicative. A careful analysis of such charges, however, shows that they were reasonable and necessary from the defendant's point of view in order to assure it treatment equal to that accorded by the processors to their independent suppliers with respect to the handling and disposition of surplus milk and that such charges were in no sense duplicative except in one minor instance as to a charge of 8 cents per cwt as to which there exists some uncertainty. The pricing formula of D.I.'s first written supply agreements included a service charge of 8 cents per cwt of Class I milk. The agreement indicates that this charge was designed to defray or help defray the cost of a series of services D.I. provides to the market in general and to customers in particular. The listed services include nonbrand advertising of milk and other dairy products, coordination of producer's assignment to customers through route organizations and production of producer payroll records, laboratory tests for both quality and butterfat and field services to insure the continued quality of D.I. members' milk. The actual cost of these services has been estimated at 26 cents per cwt, a cost exceeding the charges. Dr. Ortego, defendant's vice president of marketing, testified that the service charge of 8 cents per cwt did not cover the actual cost of the service and that in making that charge, D.I. was only striving for some token financial recognition that these services were being provided. Be that as it may, these details with respect to all of the complained of provisions of the contracts were matters for negotiation between D.I. and its customers and any misunderstandings or differences of opinion with respect thereto do not constitute or reflect predatory conduct.

Plaintiff regards as predatory defendant's conduct discussed, *supra*, as "Disputes With Handlers." Sec. III B(2)(a)–(f), and defendant's conduct relating to the alleged cut-off of Kinnett's and Borden's supplies discussed under III B(4)(a)–(b). The court is convinced and finds that none of the conduct above mentioned, taken separately or collectively, rises to the level or sinks to the depth of predatory conduct. These transactions involve and represent business negotiations between business entities. It so happens that all of them with the exception of the alleged cut-off of the supplies of Kinnett and Borden were considered in detail in the case of *United States v. Dairymen, Inc., supra*, and with respect to them the court there said:

"The United States claims . . . that the defendant engaged in five types of conduct during the years 1969–1973 which violated Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. These violations may be broadly described as follows:

1. Defendant's attempts to force processors to execute full supply contracts in order to eliminate competition and control prices." (Then follows a

listing of types 2, 3, 4, & 5, not involved in the case *sub judice.*)

"During the period 1969–1971, defendant entered into various negotiations with its customers, which the Government characterizes as refusal to deal and related exclusionary tactics. The Government points to dealings with six processing plants, to wit: Pet Plant in Jackson, Mississippi; a Mayfield Dairy Plant in Athens, Tennessee; Sealtest Plants in Nashville, Atlanta and Chattanooga; and a Broughton Plant in Lexington, Kentucky."

The court then describes what took place with respect to each of these processing plants substantially as these transactions are reviewed, *supra.* Indeed the evidence as to these transactions in the case *sub judice* consists substantially of the transcripts of the evidence adduced in the case of *United States v. Dairymen, Inc., supra.* The court then continued:

Following the sequence of events described above, defendant's Board of Directors, in July, 1971, authorized its management to enter into written supply agreements with its regular customers. These agreements would have required a handler to purchase its full supply of Grade A milk from defendant with the exception of milk then being purchased from identified nonmembers. There was also contained in the agreements a price equalization charge which imposed penalties on handlers who purchased less than 95 percent of their milk from defendant. These charges increased in proportion to the customers' purchases from defendant's competitors.

In order to induce handlers to enter into these agreements, defendant notified [sic] them that effective September 1, 1971, milk supplied would be on a day-to-day basis, although orders would be accepted on each Friday for the following week, but the day-to-day deliveries would depend on available supplies and alternative outlets. Handlers were notified that defendant took this position, since the sales agreement had not been executed for the twelve months beginning September 1, 1971.

Defendant, in an attempt to secure the agreement of its processors to the full-supply contracts, withheld all or a substantial portion of the Grade A milk supplies from those handlers who had not signed the agreement. However, difficulties were encountered in that Holland Dairy and Borden brought suits alleging that these withholding actions violated the Sherman and Clayton Acts, and as a result received temporary restraining orders requiring defendant to discontinue its withholding actions. After these suits were brought, defendant turned to a committed-supply or stated-volume agreement which was in effect for twelve months and which generally specified that the plants would purchase amounts in line with the amounts purchased in the previous year.

Defendant entered into 91 written supply contracts with handlers, and of these, 69 agreed to the initial full-supply agreements, and 22 agreed to the committed-supply agreements, although defendant offered to handlers who had already executed the full-supply agreement the option of replacing these agreements with the committed-supply type of agreements. It is admitted by the United States that the 22 committed-supply agreements are not inherently predatory, but it is contended that they were part-and-parcel of defendant's attempt to monopolize.

Both the initial full-supply agreements and the committed-supply agreements contain provisions that allowed the handler to continue to receive milk furnished by active producers who were not members of the defendant. The basic difference between the two forms of contract is that the full-supply contract requires the handler to purchase all of its Grade A milk supplies from defendant, with the exception of the supplies furnished by independent producers who had been supplying milk prior to the date of the contract, whereas the committed-supply contract requires the handler to purchase a stated volume of Grade A milk from defendant, with the exception of milk fur-

nished by independent producers under the "grandfather clause".

The court then analyzed and distinguished the predatory conduct cases relied upon by the government in that case and relied upon by the plaintiff in this case; to wit, *North Tex. Producers Assoc. v. Metzger Dairy, Inc.*, 348 F.2d 189 (5th Cir. 1965), *cert. denied* 382 U.S. 977, 86 S.Ct. 545, 15 L.Ed.2d 468 (1966); *Bergjans Farm Dairy Co. v. Sanitary Milk Producers*, 241 F.Supp. 476 (E.D.Mo.1965) *aff'd* 368 F.2d 679 (8th Cir. 1966); *Treasure Valley Potato Bargaining Assoc. v. Ore-Ida Foods, Inc.*, 497 F.2d 203 (9th Cir. 1974); *Maryland & Virginia Milk Producers Assoc. v. United States*, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960). The court then held:

We do not believe that the conduct of the defendant in entering into the full-supply and committed-supply contracts rises to the level of predatory trade practices. In so finding, we observe that the "grandfather clause" preserved the rights of the existing producers to continue to deal with the handlers. We also observe that, in many instances, the handlers were members of large national concerns with assets greatly in excess of those of the defendant, and that in many instances, these handlers had available other sources of supply to which they could readily turn, and, further, that in many instances, bargaining continued for some time over a rather protracted length of time, and that in several instances, the handlers turned to completely different sources of supply than that provided by the defendant.

D.I.'s refusal to deliver a truckload of milk to Kinnett on August 2, 1973, broadly referred to by plaintiff as a "cut-off" of milk supply, must be viewed in the context of the total factual situation outlined supra in III B(4)(a). This was not a refusal to sell milk; it was at most a refusal to sell at a price less than all other purchasers from D.I. had agreed to pay. It is true that under the written contract then in effect between plaintiff and defendant, plaintiff had a strong argument, perhaps an irrefutable argument, that the contract obligated D.I. to continue with deliveries to Kinnett

at the lower price during the remainder of the contract term. It is true, however, that the contract, PX 394, contains some ambiguities in this regard, particularly the concluding two sentences in Exhibit D attached to the contract, reading as follows:

"If any revisions are to be made in the sale of our members' product, you will be advised of such revisions in writing. Otherwise, the price arrangement hereunder is to remain in full force and effect."

D.I., however, chose not to rely on that provision, but instead to seek from all its customers written agreements to its proposed price increase. That request was made of Kinnett as early as July 12, 1973 and Kinnett took no definitive position with respect to that request until July 30, 1973 when, in the courier-delivered letter of that date it advised,

"This is in reply to your letter of July 12, 1973 with its attached Supplemental Sales Agreement, requesting an increase in the price of milk to $8.86 per cwt. effective August 1. We regret to inform you that, on advice of our attorneys, we are not in position to agree with you on the terms of your proposed price increase. If Dairymen, Inc., or any other producer, requests an emergency Federal Market Order hearing for the purpose of presenting evidence of the increase in the cost of feed and other producer costs; we will be happy to support this move. Yours very truly, John R. Kinnett, Jr."

By date of that letter, July 30, 1973, all of D.I.'s customers, save Kinnett, had agreed upon the requested price increase, and it was scheduled to take effect on the following morning. Then this belated action on the part of Kinnett jeopardized the scheduled price increase throughout the FMO–7 area. Under the circumstances then existing, including the practically unprecedented economic plight of the dairy farmers and D.I.'s binding contractual obligation not to sell to Kinnett at a lower price without giving to all other customers the opportunity to purchase at such lower price this episode is more properly regarded as a contractual or business dispute than as predatory conduct.

Similarly, we find nothing predatory on D.I.'s part in its dealings with Borden either back in 1971 when they could not see eye to eye on the advisability of written contracts, either full or committed supply, when Borden was unwilling even to discuss the matter with D.I., and D.I. had to threaten to interrupt dealings in order to get its attention, Borden then obtaining a temporary restraining order and the parties composing their differences by entering into a committed supply contract which was made a part of the court order; or later in 1977 when we see each party again trying to outbargain the other. As outlined, *supra*, in III B(4)(b) we see Borden seeking price credits and while D.I. was considering the request and perhaps acting too slowly in Borden's judgment, Borden on March 25, 1977, at the peak of the spring surplus season, tells D.I. that it plans to replace approximately 25 percent of D.I.'s supply to Borden's Macon plant. Not liking the shortness of the three-day notice or its coming at the peak of the flush season, D.I. says in effect, if you're going to reduce us to that extent at the Macon plant, you might as well cut us off entirely at the Macon plant and at your Augusta plant. Borden then upped the ante and said in effect, well and good, we will also cut you off at our Meridian, Mississippi plant. Then it was that D.I. sought and obtained against Borden the same relief which Borden and Holland had sought and obtained against D.I. back about 1971, namely a temporary restraining order. It should be remembered that as one witness expressed it, Borden had more bargaining power or market power than D.I., and that in fact, Borden had more assets than all dairy cooperatives combined. (PX 75 at 38–39). The question here may be who is cutting off whom. D.I. convinced a court that it was entitled to more notice before Borden could cease purchasing from D.I..

Plaintiff claims that D.I. acted in a predatory manner in "cut[ting] off Kinnett's profitable hauling operation in retaliation for Kinnett having dared to compete legitimately for supplies from individual farmers." The facts with respect to this "cut-off" are stated in III B(5). Assuming without deciding that D.I. should be held legally responsible for the actions of its predecessor, GMPCA, in terminating Kinnett's hauling contract, we find nothing predatory in such conduct. We find that the sole motive for terminating plaintiff's hauling contract was to terminate Kinnett's practically unlimited access to D.I.'s dairy farmer members which access Kinnett was obviously ready, willing and able to use, legitimately albeit, to persuade such members to desert D.I. at the expiration of their membership contracts and become independent producers for Kinnett. D.I. does not have, and does not claim any right to prevent such attempts at persuasion on the part of Kinnett, but at the same time, D.I. is under no obligation to provide or to continue to provide ready access for such attempts. Even if there were two possible motives for GMPCA's conduct in terminating the hauling arrangement, one lawful and the other unlawful, the law permits, if not requires, the acceptance of the lawful explanation. *Denison Mattress Factory v. Spring-Air Co.*, 308 F.2d 403, 408 (5th Cir. 1962). D.I.'s counsel poses this question: "How long would plaintiff itself have continued to employ a hauler who was attempting to convince independent producers marketing their milk directly to plaintiff to join GMPCA?"

■ Therefore, we have found, decided and determined that D.I.'s complained of activities, acting alone and acting in conjunction with others, when such activities are considered separately or collectively, were not competition stifling or predatory in any sense of the word, and that D.I. with respect to all of such activities is protected from liability by virtue of the C–V exemption. If we are correct in that finding and in those conclusions, this case could end here with a consequent full finding in favor of the defendant. The C–V exemption, however, does not grant cooperatives absolute immunity from liability under the antitrust laws. The Supreme Court held in *United States v. Borden Co.*, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1937) that a cooperative is subject to § 1 of the Sherman

Act if it conspires with outside nonproducer groups to restrain trade. In the case *sub judice* we are not concerned with that exception to immunity, however, because no such conspiracy is alleged here. The alleged co-conspirators are all Capper-Volstead farmer organizations. In *Maryland & Virginia Milk Producers, supra,* however, the Supreme Court went further and indicated that cooperatives are not exempt from Section 2 of the Sherman Act when they commit predatory practices in violation of the Sherman Act. It may be advisable therefore for us to go further and see what the result would be if we found or should have found that the complained of conduct was predatory in violation of the Sherman Act, in which event D.I. may be said to have forfeited the exemption.

In other words, let us look at D.I. as if it were not a Capper-Volstead cooperative.

*Product Market.* The court cannot agree with the defendant's claim that "milk is milk", and thus finds the relevant product market to be only Grade A milk. It is true that Grade A milk can be used for both fluid and manufacturing purposes; however, this fact alone does not warrant a finding of a "reasonable interchangeability of use" [34] between Grade A and Grade B milk. Whatever interchangeability exists is one-way; i. e., though Grade A milk may be used for Class I, II, or III purposes, Grade B milk can never be used for Class I (fluid) purposes. We are comforted in this finding and conclusion by the fact that in the case of *United States v. Dairymen, Inc., supra,* the court, after a careful review of the authorities, concluded that while "the question is quite close and is not as clearcut as that in *Brown, supra,* Exhibit GX–930 (PX 202 in the case *sub judice* ) prepared by the Farmer Cooperative Service of the United States Department of Agriculture tips the scale toward a finding that Grade A milk is the relevant product".

*Geographic Market.* The second component of the relevant market is the geographic market—that physical area in which sellers of the particular product operate and to which purchasers can practicably turn for such products.[35] As for the first part of this definition, there can be no argument with the fact that D.I. operates in an area much larger than that proposed by the plaintiff as a relevant geographic market; i. e., the FMO–7 (Georgia) area or its alternative proposal of a nine-federal order area. The defendant markets its members' milk in the following area: Alabama, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, Southern Illinois, Southern Indiana, South Carolina, Eastern Missouri, Tennessee, Virginia, and part of West Virginia. It is the second half of the geographic market definition which plaintiff urges as a problem in this case. Can the plaintiff "practicably turn" to an area outside of FMO–7 or the nine-federal order area for its milk supplies? The evidence in this case does not support a definition of the relevant geographic market as only the Georgia Federal Order (FMO–7) area or the nine-federal order area. The existence of the interstate highway system, the technological ability to preserve raw milk, and actual movements of milk all suggest a geographic market larger than the areas proposed by plaintiff. Granted, it may have been somewhat more difficult for the plaintiff to obtain supplies of raw milk outside of Georgia; however, the geographic market is not defined as an area in which all sources of supply are *equally accessible.* The court is not convinced that whatever difficulty Kinnett had in obtaining supplies outside of Georgia rises to the level of an "impracticability". Consequently, the relevant geographic market in this case is the area described above; to wit, Alabama, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, Southern Illinois, Southern Indiana, South Carolina, Eastern Missouri, Tennessee, Virginia, and part of West Virginia. It so happens that this is the same geographic market found by the court in *United States v. Dairymen, Inc., supra.*

**34.** *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

**35.** *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

Additional reasons for the nonacceptability of this alternatively proposed nine-federal order area as a geographic market or geographic submarket are set forth either herein or *supra* at IV B(4). Furthermore, as was stated by the court in *United States v. Dairymen, Inc., supra* :

Cases such as *United States v. Pabst Brewing Company,* 384 U.S. 546, [86 S.Ct. 1665, 16 L.Ed.2d 765] (1966) *and Standard Oil Company v. United States, supra,* 337 U.S. 293, [69 S.Ct. 1051, 93 L.Ed. 1371] (1949) are not of assistance in determining what constitutes a relevant submarket. Both *Pabst* and *Standard Oil, supra,* were cases brought under 15 U.S.C. Sec. 18, which refers specifically to lessening of competition in any part of the country. Under that very broad statute, the concept of relevant geographic submarkets has been developed.

This Court has been unable to find any specific instances of the use of relevant geographic submarkets in cases involving 15 U.S.C. Secs. 1 and 2 and 15 U.S.C. Sec. 14, which refer generally to unlawful restraints imposed upon commerce. It would seem that 15 U.S.C. Sec. 18 was enacted to prevent the anti-competitive effect of mergers which would in any way diminish competition substantially in any part of the country, whereas the sections of the Sherman and Clayton Acts, upon which plaintiff relies, are not couched in such local and pragmatic terms.

We conclude that plaintiff's contentions regarding a relevant geographic submarket should be rejected. If they were to be accepted, logic would require that the Court examine in detail the market statistics in each and every geographic subdivision in which defendant competes, and might even require the establishment of many relevant geographic submarkets which could be as small as the city limits of a municipality or the boundaries of a county. While such a result would be acceptable in a suit brought under 15 U.S.C. Sec. 18, we do not believe that it would follow that it is acceptable here.

Interestingly enough, the opinion on this point in *United States v. Dairymen, Inc., supra,* is the subject of an exhaustive analysis in Brown, *Relevant Geographic Market Delineation: The Interchangeability of Standards in Cases Arising Under Section 2 of the Sherman Act and Section 7 of the Clayton Act,* 1979 Duke L.J. 1152, 1183 (1979), where the author concludes as follows:

While section 7 addresses the general lessening of competition through mergers, section 2 proscribes actual monopolies. A monopoly, by definition, must exist in one market only. It is as extensive as, and no more extensive than, that market. There is no room for leeway and surely there is no room for submarkets.

Geographic areas described in federal market orders do not commend themselves particularly as candidates for recognition as relevant geographic markets for Sherman Act § 2 cases. The marketing areas of federal orders are established for administrative purposes. Using Georgia as an example, the marketing area of the Georgia federal order is only the geographic area in which a handler like Kinnett must make a specified percentage (15 percent of total) of sales of fluid milk products before becoming subject to the regulation of the order. Regulations serve purposes and have their appropriate effect, but they do not alter economic realities. With Kinnett's plant situate as it is on the eastern bank of the Chattahoochee River, to attempt to construct as its relevant geographic market by virtue of FMO–7, the state of Georgia alone, thus excluding therefrom, for instance, the state of Alabama, lying immediately across the river, would be to create an unrealistic and synthetic relevant geographic market. As was said in *Tampa Electric Co. v. Nashville Coal Co., supra,* at p. 331, 81 S.Ct. at p. 630, "We do not believe that the pie will slice so thinly."

*Market Power.* At no time relevant to this action has D.I. possessed, acquired, or maintained the power to control prices or exclude competition in any relevant geographic market. Even if D.I. intended to

acquire monopoly power in any relevant geographic market it failed to achieve its purpose because at no time did it possess the power to either control prices or exclude competition in any relevant geographic market. Nor did it ever possess such power in combination with any other organizations.

■ We need not and do not decide whether it had such power with respect to any geographical areas which have not been and cannot be recognized as a relevant geographic market. Its market share in any area arbitrarily selected or too narrowly drawn is beside the point. To calculate its market share in nine "selected" federal market order areas exclusive of Georgia's border states, like Alabama, North Carolina and South Carolina, is impermissible and even if Georgia (FMO–7 area) could be recognized, as it cannot, as a relevant geographic market, it is doubtful that D.I. enjoyed monopoly power there. True, its market share in that restricted area ranged from a high of 73 or 75 percent in 1970 to a low of 58 percent in 1979, but arrayed against that fact are potent considerations. That market share was steadily declining.[36] One reason for its decline was fixed and constant opposition to the cooperative concept by good and influential citizens like those who manned Kinnett. The contention continued that independent producers fared better than members of cooperatives. Cooperative members were not locked in. Occasionally they became persuaded to terminate their membership. For instance, during the period September 1971 until January 1972, while plaintiff and defendant were negotiating contract terms, thirteen of defendant's local members were leaving defendant to become independent producers. They had a volume large enough to supply plaintiff with approximately one-third of the amount it was then receiving from defendant. This underscores the fact that a cooperative's market power is somewhat tenuous and transitory. What power defendant had largely vanished. Plaintiff ceased purchasing from defendant. Thus, since D.I. never possessed market power in any relevant geographic market, it has not incurred liability for monopolization under Section 2 of the Sherman Act. It remains only to inquire whether it has incurred any liability for an attempt to monopolize or for a conspiracy to monopolize.

■ *Attempt to Monopolize.* An attempt charge requires proof of a specific intent to monopolize *and* a dangerous probability that the attempt will be successful in achieving the monopolization in the relevant market.[37] The specific intent required is something beyond the mere intent to do the act. It cannot even be properly characterized as an exclusionary intent. Rather, it is that particular subcategory of exclusionary intent which contemplates the use of unfair weapons or means, as opposed to mere superior skill, foresight, and industry.[38] This "illegal exclusionary intent"[39] may be inferred from conduct; however, "it is ordinarily no easy task to discern whether conduct is 'legally' exclusionary or 'illegally' exclusionary[,] [t]he difficulty stem[ming] from a recognition that all businessmen, even those honestly competing, have an exclusionary intent."[40]

---

**36.** "The significance of market power depends not only on its degree but also on its durability. Just as the degree of market power may be too trivial to warrant concern, so may it be too transitory. Substantial market power can persist only if there are significant and continuing barriers to entry." 2 P. Areeda & D. Turner, Antitrust Law ¶ 505 at 328.

"Thus, power may seem large and yet not be characterized as substantial for our purposes if it is being steadily eroded in the marketplace." 3 P. Areeda & D. Turner, Antitrust Law ¶ 807 at 294.

**37.** *In re IBM Peripheral EDP Devices,* 481 F.Supp. 965, 989 (1979).

**38.** *Union Leader Corp. v. Newspapers of New England, Inc.,* 180 F.Supp. 125, 140 (1960)

**39.** Blecher, M., *Attempt to Monopolize Under Section 2 of the Sherman Act: "Dangerous Probability" of Monopolization Within the "Relevant Market",* 38 Geo.Wash.L.Rev. 215, 217 (1969).

**40.** *Id.*

In the present case, the evidence does not show that any of the conduct set out in the record evidences that particular species of intent required in an attempt case. Even if it can be said that some of the defendant's conduct is susceptible to an interpretation of unlawful intent that would not require, even if it would authorize, a finding that the defendant had the specific intent to attempt to monopolize trade or commerce. Even when conduct is *equally* consistent with a lawful and unlawful intent, the actor is entitled to a presumption of lawfulness.[41] Consequently, the court finds as a fact and concludes as a matter of law that D.I. did not have the requisite intent required in an attempt to monopolize in violation of Section 2 of the Sherman Act.

This finding is sufficient to deal with an attempted monopolization charge, as the requirements for proving that offense are in the conjunctive. However, the court notes in passing that neither is there sufficient evidence to support the requirement of "a dangerous probability of success" in achieving a monopoly. Even though, in an attempt case, the power over the relevant market may be something short of monopoly power, it cannot be said in the present case that the defendant has a sufficient share of the relevant market to infer even a dangerous probability of success.

*Conspiracy to Monopolize.* The third charge against the defendant is that it *conspired* to monopolize in violation of Section 2 of the Sherman Act. Obviously, there is a difference in a conspiracy to monopolize and an attempt to monopolize, the conspiracy requiring some agreement, some concerted effort. However, there is an important similarity between the two charges: both involve the same specific intent—an "illegally exclusionary intent."

To establish a conspiracy to monopolize, the plaintiff must prove by a preponderance of the evidence: that there was a conspiracy; that the object of the conspiracy was to achieve monopoly power; and that there was a specific intent, an intent in the onerous sense to injure the plaintiff and injure competition as well.[42]

Whether or not any conduct, several or joint, might make the defendant liable under the monopoly charge, where specific intent is not required, such conduct cannot result in liability for conspiracy to monopolize, where this specific intent *is* required.

Considering all of the evidence in the present case, the court is not persuaded that the defendant has this intent requisite to be found to have conspired to monopolize in violation of Section 2.

Thus viewing the defendant as a non Capper-Volstead organization the result would be the same.

### CONCLUSION

*Fairdale Farms, Inc.* sheds light upon the meaning of predatory when it says that "a cooperative may neither acquire nor exercise monopoly power in a predatory fashion by the use of such tactics as picketing and harassment . . . boycotts . . . coerced membership . . . and discriminatory pricing. Neither may it use its legitimately acquired monopoly power in such a manner as to stifle or smother competition." In the present case we have heard nothing of coerced membership, nor of picketing and harassment, nor of boycotts, nor of discriminatory pricing, even though the defendant operates a processing plant in Columbus, Georgia, in direct competition with Kinnett. The evidence of "such tactics" is conspicuously absent.

The plaintiff contends for predatory conduct in this case only in the looser or less pejorative sense of the word. For instance at pretrial plaintiff's counsel stated:

"If we're talking about predatory conduct in that sense, purposeful conduct

---

41. *Denison Mattress Factory v. Spring-Air Co.*, 308 F.2d 403, 408 (5th Cir. 1962); *see also Dehydrating Process Co. v. A.O. Smith Corp.*, 292 F.2d 653 (1961).

42. *Old Homestead Bread Co. v. Continental Baking Co.*, Civil No. CA 844 (D.Colo.1971) (ABA Antitrust Section, Antitrust Civil Jury Instructions, p. 88 (1972)).

intended to kill off a competitor or to maim him severely so as to affect his ability to compete, I would say to you frankly that I don't really think we're talking about that type of situation here. Now some people have defined predatory in a less nefarious sense—any act which was intended to acquire or maintain monopoly power .... We are not charging in this case that D.I. in essence sought to eliminate Kinnett. We are not taking that position. There is no strong evidence to support that assertion .... It's not what I call a predatory case .... The heart of our case is what I call this network of arrangements with the Georgia Super Pool, with ARSPC and with Great Lakes and Southern. These are what we contend are a series of artificial arrangements which have restricted .... When you put all those together, you've got the supply of milk in the eastern southern United States tied up. Now we think it's through that network that they have been able to get this premium price .... The closest we came to predatory is conduct on the part of Dairymen ... in the summer of 1973 [when] Dairymen ... refused to sell Kinnett unless he would agree to rewrite an existing contract at still higher prices. Finally ... the refusal to permit Kinnett to haul milk of its D.I. members—an act there which shows a purposeful intent in this case to hurt Kinnett because they let other processors continue to haul Dairymen's milk."

With predation eliminated, largely by admission, and entirely by evidence and the lack thereof, and there being no conscious intent to stifle or smother competition or to exclude others from the market place, *Lorain Journal Co. v. United States*, 342 U.S. 143, 153, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951); *In re IBM Peripheral EDP Devices, etc.*, 481 F.Supp. 965, 1010 (N.D.Cal.1979), plaintiff is relegated to its reliance upon the network of arrangements with other cooperatives as somehow violating the Sherman Act. This network of arrangements is authorized by Section 6 of the Clayton Act and by the Capper-Volstead Act. *Fairdale Farms, Inc., supra.* If this authorization is to be taken away it should be taken away by the Congress which granted it and not by the courts.

D.I. has not violated Section 1 or Section 2 of the Sherman Act:

Not Section 1 because Capper-Volstead grants full immunity to Capper-Volstead organizations acting separately or collectively in fixing prices and in conducting other marketing activities, absent agreements with outsiders. *Fairdale Farms, Inc. v. Yankee Milk, Inc., supra* ;

Not Section 2 because Capper-Volstead grants full immunity as to Section 2 violations, absent agreements with outsiders and absent predatory conduct in violation of the Sherman Act. And even if Capper-Volstead did not apply, D.I. did not monopolize, lacking monopoly power in the relevant geographic market; and did not attempt to monopolize, lacking specific intent and dangerous probability of success; and did not conspire to monopolize, lacking specific intent. *Fairdale Farms, Inc. v. Yankee Milk, Inc., supra.*

There being no monopolization, there is no monopoly increment in defendant's pricing as alleged; and therefore, there can be no recovery of alleged damages as a result of the pricing practices.

Likewise, since the termination of plaintiff's hauling arrangement was a fully justified business transaction on the part of defendant's predecessor and was intended to protect the legitimate interests of its members, there can be no recovery of the alleged loss of hauling profits.

Verdict and judgment are being prepared in accordance herewith.